**Brenda Kay MONROE et al.**

v.

**BOARD OF COMMISSIONERS, CITY OF JACKSON, Jackson, TENNESSEE.**

**Civ. No. 1327.**

United States District Court
W. D. Tennessee, E. D.

July 30, 1965.

See also D.C., 229 F.Supp. 580.

Z. Alexander Looby and Avon N. Williams, Jr., Nashville, Tenn., J. Emmett Ballard, Jackson, Tenn., Jack Greenberg, Constance Baker Motley, James M. Nabritt, III, New York City, for plaintiffs.

Russell Rice, Jackson, Tenn., for defendants.

BAILEY BROWN, District Judge.

Plaintiffs have filed motions for additional relief, which raise these issues:

1. Whether the assignment and transfer plan and policies as actually carried out by the defendants violate plaintiffs' constitutional rights, and if so, to what extent must the plan or policies be amended;

2. Whether the amended unitary zones for elementary schools and the proposed unitary zones for junior high schools are gerrymandered to maximize segregation and thereby violate plaintiffs' constitutional rights;

3. Whether the plan for gradual desegregation heretofore approved by the court, viewed as of now, meets the constitutional standard of "all deliberate speed";

4. Whether plaintiffs are entitled, under the Constitution, to an order requiring the desegregation of faculty, administrative and supporting personnel, and faculty in-service training programs;

5. Whether plaintiffs are entitled, under the Constitution, to an order prohibiting segregation in curricular and extra-curricular activities;

6. Whether plaintiffs are entitled to recover attorneys fees incurred in connection with these motions.

We will dispose of these issues in the order in which they are set out above.

At the outset it should be noted, as we have indicated, that plaintiffs are asserting Fourteenth Amendment rights alone, and are asserting no rights under any Act of Congress.

In dealing with the multifarious issues that may be presented in school desegregation cases, there frequently is difficulty in deciding a particular issue even if the applicable principle of law has been fairly well crystalized. This is especially true in this field because, even though so crystalized, an applicable principle is of necessity a general principle which must be applied to myriad factual situations. More difficulty is encountered, however, when an underlying general principle has not yet become clear. An example of this is the lack of complete clarity as to whether the Constitution requires only an abolition of compulsory segregation based on race or requires something more. This general question must first be answered before we can deal with the assignment and transfer issue and the gerrymandering issue.

This court has heretofore considered the question as to whether the Constitution requires only an abolition of compulsory segregation based on race. Vick et al. v. Board of Education of Obion County, Tennessee, 205 F.Supp. 436 (W.D.Tenn.1962); Monroe et al. v. City of Jackson, Tennessee, 221 F.Supp. 968 (W.D.Tenn.1963); and Monroe et al. v. Board of Com'rs of Jackson, Tenn., 229 F.Supp. 580 (W.D.Tenn.1964). The latter two opinions were rendered at earlier stages of the separate proceedings in this action. We concluded in these opinions that abolition of segregation based on race is all that the Constitution requires. We based this conclusion not only on our interpretation of the second Brown opinion (Brown v. Board of Education of Topeka, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1954)) and Cooper v. Aaron, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5, (1958), but also on the now famous specific statement to that effect in Briggs v. Elliott, 132 F. Supp. 776 (E.D.S.C.1955), which was a *per curiam* opinion by a three-judge court presided over by Judge Parker of the Court of Appeals for the Fourth Circuit. However, plaintiffs again earnestly contend that the Constitution requires an integrated education, and so we have taken this occasion again to review the law.

We find that the following opinions, among others, cite and approve the statement in Briggs v. Elliott, supra, to the

effect that the Constitution requires only an abolition of compulsory segregation based on race: Kelley v. Board of Education of Nashville, 270 F.2d 209, 226 (6th Cir. 1959); Bell et al. v. School City of Gary, 324 F.2d 209, 213 (7th Cir. 1963); Griffin v. Board of Supervisors of Prince Edward County, 322 F.2d 332, 336 (4th Cir. 1963); Dillard v. School Board of City of Charlottesville, 308 F. 2d 920, dissent at p. 926 (4th Cir. 1962); Boson v. Rippy, 285 F.2d 43, 48 (5th Cir. 1960); Avery v. Wichita Falls Independent School Dist., 241 F.2d 230, 233 (5th Cir. 1957); Armstrong v. Board of Education of Birmingham, 323 F.2d 333, dissent at p. 346 (5th Cir. 1963); Taylor v. Board of Education of New Rochelle, 294 F.2d 36, dissent at p. 47 (2nd Cir. 1961). It is interesting to note that the Fifth Circuit in a very recent case (Singleton v. Jackson Municipal Separate School Dist., 348 F.2d 729, decided June 22, 1965), recognizing that it had more than once approved the statement in Briggs, said that it now "should be laid to rest" and that " * * * the second Brown opinion clearly imposes on public school authorities the duty to provide an integrated school system." There is other authority in support of the view now taken by the Fifth Circuit, but the clear weight of authority in the Courts of Appeal and District Courts supports the view taken in Briggs and, as stated, our Court of Appeals in the Kelley case, supra, seems to subscribe to the Briggs view.

This question as to what the Constitution requires comes into sharper focus in two different contexts: one is a situation in which "honestly" arrived at unitary zones result in *de facto* school segregation because of existing racial housing patterns; the other is a situation in which a voluntary assignment and transfer provision, not based on race, results in the continuance of segregation. In Northcross et al. v. Board of Education of Memphis, 333 F.2d 661 (6th Cir. 1964) our Court of Appeals recognized that there is no constitutional obligation to draw zone lines to maximize integra-

tion. See also, to the same effect, Downs et al. v. Board of Education of Kansas City, 336 F.2d 988 (10th Cir. 1964), cert. denied 380 U.S. 914, 85 S.Ct. 898, 13 L.Ed.2d 800 (1965). The Supreme Court has not dealt specifically with the first situation, but it has done so with the second. In Goss et al. v. Board of Education of City of Knoxville, 373 U.S. 683, 83 S.Ct. 1405, 10 L.Ed.2d 632 (1963), the Supreme Court struck down transfer provisions which allowed pupils who, under the rezoning, would be required to attend a school in which they would be in a racial minority to transfer to a school in which they would be in a racial majority. In so doing, the Court said at pp. 686–687, 83 S.Ct. at p. 1408:

> "It is readily apparent that the transfer system proposed lends itself to perpetuation of segregation. Indeed, the provisions can work only toward that end. While transfers are available to those who choose to attend school where their race is in the majority, there is no provision whereby a student might transfer upon request to a school in which his race is in a minority, unless he qualifies for a 'good cause' transfer. As the Superintendent of Davidson County's schools agreed, the effect of the racial transfer plan was 'to permit a child [or his parents] to choose segregation outside of his zone but not to choose integration outside of his zone.' Here the right of transfer, which operates solely on the basis of a racial classification, is a one-way ticket leading to but one destination, i. e., the majority race of the transferee and continued segregation. This Court has decided that state-imposed separation in public schools is inherently unequal and results in discrimination in violation of the Fourteenth Amendment. Brown v. Board of Education of Topeka, 347 U.S. 483, [74 S. Ct. 686, 98 L.Ed. 873, 38 A.L.R.2d 1180] (1954). Our task then is to decide whether these transfer provisions are likewise unconstitution-

al. In doing so, we note that if the transfer provisions were made available to all students regardless of their race and regardless as well of the racial composition of the school to which he requested transfer we would have an entirely different case. Pupils could then at their option (or that of their parents) choose, entirely free of any imposed racial considerations, to remain in the school of their zone or to transfer to another. "Classifications based on race for purposes of transfers between public schools, as here, violate the Equal Protection Clause of the Fourteenth Amendment."

And the Court further said at pp. 688–689, 83 S.Ct. at p. 1409:

"The alleged equality—which we view as only superficial—of enabling each race to transfer from a desegregated to a segregated school does not save the plans. Like arguments were made without success in Brown [347 U.S. 483, 74 S.Ct. 686, 98 L. Ed. 873, 38 A.L.R.2d 1180], supra, in support of the separate but equal educational program. Not only is race the factor upon which the transfer plans operate, but also the plans lack a provision whereby a student might with equal facility transfer from a segregated to a desegregated school. The obvious one-way operation of these two factors in combination underscores the purely racial character and purpose of the transfer provisions. We hold that the transfer plans promote discrimination and are therefore invalid.

"This is not to say that appropriate transfer provisions, upon the parents' request, consistent with sound school administration and not based upon any state-imposed racial conditions, would fall. Likewise, we would have a different case here if the transfer provisions were unrestricted, allowing transfers to or from any school regardless of the race of the majority therein. But no official transfer plan or provision of which racial segregation is the inevitable consequence may stand under the Fourteenth Amendment."

It appears that the Court held that these transfer provisions could not stand for two separate reasons: first, on their face they contained an invalid racial classification, and second, they could operate only to perpetuate segregation. However, the Court expressly recognized that a transfer provision or policy which did not contain a racial classification and which allowed transfers as readily to a school in which the applicant would be in a racial minority as it allowed transfers to a school in which the applicant would be in a racial majority would be valid. The Court therefore did not hold that integration is a required end result of the provision or policy. And, as we said in our earlier opinion in this very action (221 F.Supp. 968, 974), it is difficult to see how it could be held that segregation resulting from purely voluntary choice could violate the Fourteenth Amendment as it would not be "state-imposed separation." Similarly, it is difficult to see, for the same reason, how it could be held that segregation that resulted from "honestly" arrived at geographical zoning could violate the Fourteenth Amendment. We therefore conclude, as we concluded before, that the Constitution does not require integration and that it only requires the abolition of compulsory segregation based on race.

We come now to consider the contention of plaintiffs that the assignment and transfer plan or policy as actually carried out by defendants deprives plaintiffs of their constitutional rights, and if so, to what extent must the plan or policies be amended. In the plan heretofore approved by this Court in the summer of 1963, pupils already attending school in the system during the 1962–63 school year were to be allowed to continue in the school they were attending until graduation irrespective of whether they lived in the new unitary zone of that school, provided that all pupils who lived in the unitary zone of the school and who were entitled for that reason to attend

the school would have a preferential right to attend. We approved this provision for reasons set out in our opinion (221 F.Supp. 968, 972), pointing out that the provision would expire by its own terms in a relatively few years. With respect to assignments and transfers generally, we merely held (221 F.Supp. 968, 971) that defendants could adopt any plan or policy with respect to desegregated grades, provided that no assignment or transfer could be based on race or have as its purpose the delay of desegregation as contemplated by the plan.

■■ It appears that defendants, in two particulars, have gone beyond what they were allowed to do with respect to assignments and transfers:

1. They have allowed pupils as a matter of course to be assigned or to be transferred out of their unitary zones to a school in which they would be in a racial majority and have not allowed pupils as a matter of course to be assigned or to be transferred out of their unitary zones to a school in which they would be in a racial minority. More specifically, they have allowed white pupils as a matter of course to attend schools, outside of their unitary zones, in which white pupils predominate, and have allowed Negro pupils as a matter of course to attend schools, outside of their unitary zones, attended only by Negroes but they have denied Negroes (and specifically intervening plaintiffs) the right to attend predominantly white schools outside of their unitary zones. This plan or policy clearly deprives plaintiffs of their constitutional rights, as was held by the Supreme Court in the Goss case, supra, and is clearly contrary to our prior holding.

2. They have treated pupils, after they were allowed in 1963–64 and 1964–65 to attend schools outside of their unitary zones, as if they were thereafter covered by the approved provision allowing only pupils attending in the system in 1962–63 to continue until graduation in the school in which they were then enrolled. This approved provision, by its own terms, applied only to pupils attending in the system in 1962–63.

■ If defendants intend to continue this policy of allowing white and Negro pupils to attend schools outside of their unitary zones where they will be in a racial majority, they must, beginning with the 1965–66 school year, also allow white and Negro pupils to the same extent and under the same terms to attend schools outside of their unitary zones where they will be in a racial minority. This is required by the Goss case, supra, and by the decree heretofore entered. Moreover, those Negro pupils who have heretofore applied for and been denied the right to attend predominantly white schools outside their unitary zones must be admitted to such schools, at least in the school year 1965–66, if they so desire. This is necessary to vindicate the Constitutional rights which have been denied to them, whether or not the defendants choose to follow the policy herein approved, of allowing pupils to attend schools outside their unitary zones irrespective of whether they will be in a racial majority or minority.

■ It appears that, in carrying out their policy of allowing white and Negro pupils to attend schools outside their unitary zones in which they would be in a racial majority, defendants have not required these pupils to register in the schools of their unitary zones and then to apply for a transfer. Rather, they have allowed these pupils to register directly in the schools outside of their zones. Plaintiffs contend that, if defendants choose to go forward with the amended policy and plan which the Court is here approving, each pupil should be required each year to register in the school of his unitary zone and apply for a transfer; this is necessary, argue plaintiffs, to make the choice more realistic. More specifically, it is argued that, given the long history of segregation, white and Negro pupils would be much less likely to choose to attend the school of the unitary zone in which they live,

if they would be in racial minority in that school, if they are allowed to register directly in a school in another zone in which they would be in a majority. While we believe, as we have held, that a system of voluntary choice is constitutional, we also believe that every safeguard should be had to insure that choices will be conscious and considered choices and that such a choice will more likely be made if pupils are required each year initially to register in the school of the zone in which they live. Accordingly, we conclude that this must be required by defendants.

■ With respect to the other particular in which defendants have gone beyond what they were allowed to do, pupils who were not in the school system in 1962–63 shall not have the right, as do pupils who were attending during that year, to continue until graduation in a school outside their unitary zone.

■ The next issue presented is whether the amended unitary zones for elementary schools and the proposed unitary zones for junior high schools are gerrymandered so as to maximize segregation. Before dealing with this issue, we should note that plaintiffs first contend that even if the zones are not gerrymandered, they will create a large measure of *de facto* segregation, and therefore they must be redrawn to bring about more integration. However, we dealt with this contention in our earlier opinion in this case (221 F.Supp. 968, 973), and we have heretofore dealt with it again in this opinion. We have reached the conclusion that "honestly" drawn zone lines, which result in *de facto* segregation, do not deprive plaintiff of any constitutional rights.

In approaching the gerrymandering issue, we must first ascertain from the adjudicated cases what constitutes gerrymandering in school zoning. The Northcross case, supra, and the Downs case, supra, hold that a school board may, in its discretion, use any rational basis for drawing zone lines but that it, of course, cannot consider race as a factor. Northcross specifically holds that the motive of minimizing the disturbance of the people and the motive of preserving school loyalties are not proper considerations in zoning. Northcross recognized that such considerations as utilization of the buildings, proximity of the pupils to the schools, and natural boundaries are proper considerations. Northcross also holds that, when challenged, the burden of proof is on the school board to show that boundaries were not drawn with a view to preserve the maximum amount of segregation.

In an earlier stage of these proceedings the Court approved elementary school zones as submitted by defendants but, on these motions for further relief, allowed plaintiffs to reopen the question as to whether these zones are gerrymandered. Defendants have redrawn the boundary between West Jackson and South Jackson elementary schools and, as so amended, have submitted these elementary school zones for approval. Defendants have, pursuant to an order of the Court heretofore entered, established unitary zones for the three junior high schools and, by consent of all parties, the hearing with respect to these zones was held concurrently with the hearing on plaintiffs' motions for further relief. It is the contention of plaintiffs that both the elementary school zones and the junior high school zones are gerrymandered and that the Court should appoint a master to redraw the zone boundaries or require the defendants to redraw them and resubmit them for approval.

Defendants have prepared and introduced into evidence maps reflecting the location of the schools, the zone boundaries, and the location of the homes of white (in blue) and Negro (in red) children of school and pre-school age. Defendants also offered in evidence exhibits showing the capacity of the schools, the number of pupils that have been attending each, and the average size of classes. The superintendent testified that the zones were drawn without regard to race and are the result of a consideration of utilization of buildings,

proximity of pupils to the schools and natural boundaries.

In addition to contending that defendants' proof shows on its face that the zones are gerrymandered, plaintiffs offered two expert witnesses, who had also prepared maps, and who contended that the zones are gerrymandered. However, the value of the testimony of these experts was undercut by the fact that they assumed that it is the duty of defendants to maximize integration because of educational benefits that would, in their opinion, flow therefrom. The value of their testimony with respect to elementary schools was further somewhat undercut because their maps were aimed to show the amount of *de facto* segregation that has resulted after two years under the plan. However, in view of voluntary transfers by white and Negro pupils, the degree of actual segregation in these schools does not itself show that the zones are gerrymandered. The value of the testimony of these experts with respect to junior high schools was somewhat undercut because they not only again assumed a duty to maximize integration but also assumed that defendants had the duty to adopt a "feeder" system whereby certain elementary schools would send their graduates only to a particular junior high. These experts admitted that in many instances the question as to where a boundary should be drawn is one of judgment as to which honest experts could disagree.

We believe that, under the Northcross case, supra, the question whether the zones are gerrymandered should be determined primarily by consideration of the utilization of buildings, proximity of pupils to the schools, and natural boundaries.

It would be useless to set out in this opinion the relevant facts with respect to utilization, proximity and natural boundaries as to each elementary school zone. (It should be noted here that, as to utilization, the best information we have is the capacity and enrollment of each school during the past school year, which, in view of volun-

tary transfers, may not be an accurate projection as to the coming year and future years.) Rather, we will discuss only those boundaries as to which there appears to be gerrymandering.

The most recent figures show that South Jackson is over enrolled and that West Jackson is under capacity. The boundary between these unitary zones as approved by the Court places Negro pupils who live much closer to West Jackson (which has been a predominantly white school but has had 14 Negro pupils) in the zone of South Jackson (which has been an all Negro school). Defendants, at the hearing, proposed to redraw that line so as to partially correct this situation but their proposal does not completely correct it. We conclude that the south line of the West Jackson zone should extend eastwardly from Poplar along Main to Royal.

The most recent figures show that both Parkview (which has been a predominantly white school with only one Negro pupil) and Washington-Douglas (which has been an all Negro school) are under capacity. The boundary between these unitary zones as approved by the Court places Negro pupils who live much closer to Parkview in the zone of Washington-Douglas. And while the proof shows that there is considerable new development in the eastern part of the Parkview zone, there is nothing to show that Parkview would be over capacity if its zone is extended westwardly to include these Negro pupils. We conclude that the zone of Parkview should be extended westwardly to include the area bounded by Chestér on the south, Royal on the west and College on the north.

The most recent figures show that both Alexander (which has been a predominantly white school but has had 87 Negro pupils) and Lincoln (which has been an all Negro school) are under capacity. The boundary between these unitary zones as approved by the Court follows the I.C.R.R. and G.M. & O.R.R. tracks southwesterly until it reaches Alice and then leaves these tracks and runs west on Alice to Royal and south on Royal to

Preston. This means that there are Negro pupils who live much closer to Alexander but who must cross the railroad tracks to Lincoln. It is true that Lincoln has been somewhat more under capacity than Alexander. However, if it should become necessary, defendants could make an adjustment in the boundary between the Alexander zone and the Highland Park zone, the latter school also being under capacity. We conclude that the portion of the Lincoln zone bounded by the railroad tracks on the east, Alice on the north, Royal on the west and Preston on the south should be included in the Alexander zone.

 There are three junior high schools in Jackson. Tigrett and Jackson have been all white schools and Merry has been all Negro. Tigrett is located in the western section, Merry is located in the central section and Jackson is located in the eastern section. The zones proposed by the defendants would, generally, allocate the western section to Tigrett, the central section to Merry, and the eastern section to Jackson. The boundaries follow major streets or highways and railroads. According to the school population maps, there are a considerable number of Negro pupils in the southern part of the Tigrett zone, a considerable number of white pupils in the middle and northern parts of the Merry zone, and a considerable number of Negro pupils in the southern part of the Jackson zone. The location of the three schools in an approximate east-west line makes it inevitable that the three zones divide the city in three parts from north to south. While it appears that proximity of pupils and natural boundaries are not as important in zoning for junior highs as in zoning for elementary schools, it does not appear that Negro pupils will be discriminated against. The only real alternative offered by plaintiffs is to adopt a "feeder" system whereby certain elementary schools would "feed" pupils to a particular junior high, but there is no constitutional requirement that this particular system be adopted. We conclude that the proposed junior high school zones proposed by defendants do not amount to unconstitutional gerrymandering.

 Under the plan for gradual desegregation approved by the Court in the summer of 1963, the first three grades were desegregated in the school year 1963-4, the next three grades in 1964-5, and thereafter two additional grades are to be desegregated each succeeding year. Under this plan, the 7th and 8th grades only would be desegregated in the coming year, 1965-6. Plaintiffs moved the Court to amend the plan to require all remaining grades be desegregated in 1965-6, and the Court has allowed them to reopen this question. They contend that "all deliberate speed" requires this action.

In view of the undisputed proof that no substantial administrative problems have so far been met, we conclude plaintiffs are entitled to some acceleration in the plan. More particularly, we conclude that all of the junior high grades (7th, 8th and 9th) should be desegregated in the year 1965-6; and we further conclude that all of the senior high grades (10th, 11th and 12th) should be desegregated in 1966-7.

Plaintiffs also moved the Court to order desegregation of teachers, and the administrative and supporting personnel. At an earlier stage of this proceeding, we held that plaintiffs are entitled to assert a claim for desegregation of teachers and principals, but that they are not entitled to assert a claim for desegregation of other personnel. We took under advisement the claim with respect to teachers and principals pending implementation of the plan, and we ordered struck from the complaint the claim with respect to other personnel. (221 F.Supp. 968, 972) This determination was made on the basis of the clear holding to that effect by our Court of Appeals in Mapp v. Board of Education of Chattanooga, 319 F.2d 571, 576 (6th Cir. 1963). Accordingly, we have for consideration only the claim for desegregation of teachers and principals.

We first must ascertain the guidelines for determining whether plaintiffs are entitled to desegregation of faculty and principals. We must do this from a very limited number of cases which deal with the problem. As stated, our Court of Appeals held that plaintiffs in such a case as this are entitled to press this claim as part of their claim "to an education free of any consideration of race." It also held that they had no right to assert any constitutional claims the teachers and principals may have. (Mapp, supra.) However, the Court was not specific, saying in part (319 F.2d 571, 576):

> "We agree that the teachers, principals and others are not within the class represented by plaintiffs and that plaintiffs cannot assert or ask protection of some constitutional rights of the teachers and others, not parties to the cause. We, however, read the attack upon the assignment of teachers by race not as seeking to protect rights of such teachers, but as a claim that continued assigning of teaching personnel on a racial basis impairs the students' rights to an education free from any consideration of race.
>
> \* \* \* \* \* \*
>
> "\* \* \* [W]e think it appropriate that the stricken allegations of the complaint, insofar as they relate to the assignment of teachers and principals, be restored to the pleading and that decision of the legal question presented await developments in the progress of the plan approved. Nothing we have said need call for any present taking of testimony on the subject of teacher and principal assignment. Within his discretion, the District Judge may determine when, if at all, it becomes necessary to give consideration to the question under discussion. We affirm, however, the order granting the motion to strike, to the extent that it applies to allegations relating to the hiring and assignment of school personnel other than teachers and principals."

In Augustus v. Board of Public Instruction of Escambia County, Florida, 306 F.2d 862 (5th Cir. 1962) the Court held, as Mapp later held, that it was improper to strike this claim for relief before the trial on the merits and indicated that at such hearing relief could be granted. In Board of Public Instruction of Duval County, Florida v. Braxton, 326 F.2d 616 (5th Cir. 1964) the Court held (one judge dissenting) that the trial court was within its proper discretion in ordering a desegregation of faculty in a decree providing for desegregation of pupils. In Bradley v. School Board of City of Richmond, Virginia, 345 F.2d 310 (4th Cir. 1965) the Court held that the trial court was within its discretion in denying an application for desegregation of teachers. It pointed out that this issue had been ignored at the trial, and said that the granting of such relief should depend upon a balancing of the need therefor to protect the constitutional rights of the pupils against the effect it would have on the administration of the schools and the efficiency of the staffs. Two judges, dissenting on this question, said at p. 324:

> "The composition of the faculty as well as the composition of its student body determines the character of a school. Indeed, as long as there is a strict separation of the races in faculties, schools will remain 'white' and 'Negro,' making student desegregation more difficult. The standing of the plaintiffs to raise the issue of faculty desegregation is conceded. The question of faculty desegregation was squarely raised in the District Court and should be heard. It should not remain in limbo indefinitely. After a hearing there is a limited discretion as to when and how to enforce the plaintiffs' rights in respect to this, as there is in respect to other issues, since administrative considerations are involved; but the matter should be inquired into promptly. There is no legal reason why desegregation

of faculties and student bodies may not proceed simultaneously."

In one District Court case in Tennessee, Sloan v. Tenth School District of Wilson County, Tennessee, 9 Race Rel.L.Rep. 1306 (M.D.Tenn.1964), the Court ordered desegregation of faculties, and we understand that this has been done by consent order in several other cases involving school districts of this state.

We glean from the foregoing cases that this application for desegregation of faculties and principals largely addresses itself to the discretion of the trial court and that in exercising its discretion the Court should consider the current need for this action in effecting abolition of compulsory segregation of pupils as against any problems involved in taking this step.

The defendants contend that there is no current need to desegregate the faculties and principals and that the teachers might be seriously adverse to such action. Plaintiffs offered some testimony from Negro parents that Negro pupils are reluctant to attend schools in which all of the teachers are white, some because they are afraid that the white teachers would require higher performance and perhaps others because they are afraid that they would not receive fair treatment. These witnesses gave no specific examples. It should be noted, however, that the intervening plaintiffs, at least, are seeking to attend schools with all white faculties. Plaintiffs' education experts largely testified in terms of the educational desirability of mixed faculties, but we do not believe that this is a constitutional consideration. Plaintiffs' sociology expert testified that in his investigation of the question at Nashville he had not turned up much evidence that fear of going to school to all white teachers is a deterrent, but he also testified that having all Negro teachers stigmatizes a school as a "Negro" school which tends to keep it segregated.

We do not believe that the proof of the plaintiffs is sufficiently strong to entitle them at this time to an order requiring integration of the faculties and principals. At the same time we do believe that they are, on this proof, entitled to some relief, and this Court in its discretion may fashion the remedy which it believes to be consistent with the need shown. It is obvious that the defendants have followed a policy of assigning white teachers, simply because of their race, only to schools in which the pupils are all or predominantly white, and of assigning Negro teachers, simply because of their race, only to schools in which the pupils are predominantly Negroes. We believe that this policy should be rescinded, and that a white teacher should not be prohibited, because of his or her race, from teaching in a school in which the pupils are all or predominantly Negro, and that a Negro teacher should not be prohibited, because of his or her race, from teaching in a school in which the pupils are all or predominantly white. This would mean that white and Negro teachers, who so desire, would not be barred, because of their race, from teaching pupils all or a majority of whom were of the other race. But it also would mean that none would be forced to do so and would mean that, of course, all other usual factors could be considered in determining the assignment of teachers.

Plaintiffs next contend that they are entitled to an order prohibiting all segregation in curricular and extra-curricular activities of desegregated grades. As to curricular activities, we were under the impression that such a provision had been included in the decree heretofore entered, but for some reason it was omitted. In any event, plaintiffs are entitled to an order providing that, with respect to desegregated grades, segregation is prohibited as to all school facilities, and as to all curricular activities, including athletics.

The question regarding extra-curricular activities is more difficult. Certainly, as to school-sponsored activities, there must be no discrimination based on race by the defendants, and

plaintiffs are entitled to an order to that effect. However, we must deal in particular with an incident which has occurred which plaintiffs contend amounted to discrimination in a school-sponsored activity. It seems that the private organization which operates the Jackson Symphony Orchestra invited the pupils in certain grades in those elementary schools in which the pupils are all or predominantly white to attend a concert during school hours. The pupils in the same grades in elementary schools in which the pupils are all Negroes were not invited. Defendants accepted this invitation, and the invited pupils, including those Negro pupils who were in those grades, attended the concert. The proof showed without question that defendants were not motivated by racial considerations in accepting this invitation. We believe that this occurrence does not constitute unconstitutional discrimination. On the contrary, we believe that defendants may in their discretion allow pupils to attend an outside activity, whether it be a concert, a speaker or whatever, so long as defendants are not motivated by racial considerations.

Plaintiffs also seek an order prohibiting segregation of teacher in-service training. Although the proof is not completely clear, it appears that the only such segregation that remains results from the fact that the white teachers and the Negro teachers are members of separate professional organizations. It appears without dispute that defendants do not control the policies of these organizations. In any event, as heretofore indicated, the Mapp case, supra, holds that plaintiffs have no standing to assert any constitutional claims that the teachers may have and may assert a claim for teacher desegregation only in support of their constitutional right, as pupils, to an abolition of discrimination based on race. The assertion by plaintiffs that what remains of segregation in teacher in-service training has an effect on their right as pupils is, on the proof in this case, extremely tenuous. We deny this application for relief.

Plaintiffs last contend that defendants should be required to pay their attorneys' fees and to pay expenses incurred by plaintiffs in the employment of certain expert witnesses.

With respect to attorneys' fees, it is incumbent on plaintiffs first to prove a legal liability on their part to pay such fees, that is, plaintiffs must prove an express or implied contract to pay either a fee specific in amount or a reasonable fee. 20 C.J.S. Costs § 218 p. 455 et seq. The proof here shows that when some of intervening plaintiffs were denied the opportunity to attend the schools to which they had applied, they called on these attorneys to represent them. The attorneys, after interviewing these plaintiffs, forthwith filed the first motion for additional relief and thereafter handled this litigation. While there was some proof that the attorneys might be able to look elsewhere for payment in the event intervening plaintiffs did not pay them, there was certainly an implied contract between these plaintiffs and the attorneys that a reasonable fee would be paid by them.

In Bell v. School Board of Powhatan County, Virginia, 321 F.2d 494, 500 (4th Cir. 1963), a school desegregation case, the court held that the trial court had abused its discretion in refusing to allow plaintiffs to recover attorneys' fees. In that case the school authorities had been guilty of " * * * a long continued pattern of evasion and obstruction * * *." In a later school segregation case, the Fourth Circuit affirmed the trial court in its denial of attorneys' fees, but recognized that a fee should be allowed " * * * when it is found that the bringing of the action should have been unnecessary and was compelled by the school board's unreasonable, obdurate obstinancy." Bradley v. School Board of the City of Richmond, 345 F.2d 310 (4th Cir. 1965).

In this case during the summer of 1964 when intervening plaintiffs applied to attend schools outside of their zones, defendants were, as a matter of course, allowing both white and Negro

pupils to do so if they would be in a racial majority. It appears that the applications of plaintiffs were denied by the superintendent because they would be in a minority in the schools they sought to attend. The action by the superintendent in denying their applications was in clear violation of the decree of this court, and it was in clear violation of the constitutional rights of these plaintiffs as had been expressly held by the Supreme Court in Goss et al. v. Board of Education of City of Knoxville, 373 U.S. 683, 83 S.Ct. 1405, 10 L.Ed.2d 632 (1963), all of which defendants must have, or certainly should have, known. For this reason, plaintiffs are entitled to recover an attorneys' fee for their handling of this aspect of the litigation. It is no answer to say that these plaintiffs did not seek redress from the action of the superintendent by appealing to the defendant Board members. Defendants do not even contend that the superintendent was not acting with authority; it appears that he was following an adopted plan or policy. Moreover, the proof shows that plaintiffs were not advised that their applications had been denied until the Saturday before the Monday that the school session was to begin.

On the other hand, with respect to the other issues presented by these motions for additional relief, it does not appear that defendants have violated any order of this court or have in any wise acted improperly. We therefore award plaintiffs an attorneys fee of $1,000.00 as costs in this cause.

As stated, plaintiffs also seek to recover as costs the fees and expenses of their expert witnesses. However, these experts did not testify on any issue as to which this court has found defendants in violation of its decree or as to any issue as to which the court has found that defendants have acted in disregard of the constitutional rights of these plaintiffs. Moreover, these experts in large measure gave educational or sociological opinions of no particular constitutional relevance. We therefore deny this application.

In closing this opinion, this court would like to point out that there appears to be little communication between the school authorities and the interested Negro leadership in the community. There certainly should be. As desegregation progresses under this plan, there are bound to be points of difference between the Negro citizens and the school authorities as to rights of the Negroes and the obligations of the authorities. These differences should first be the subject of a conference in an effort to compose them amicably. They should be brought to court only when the differences cannot so be resolved and are of substantial significance.

An order will be prepared for entry by the parties consistent with the rulings in this opinion.