Claude Bernard **ROBINSON** and Julia D. Robinson, Infants, by Melvin Robinson, Their Father and Next Friend, et al., Plaintiffs,

**United States of America, Plaintiff-Intervenor,**

v.

**The SHELBY COUNTY BOARD OF EDUCATION, Defendant.**

**Civ. A. No. 4916.**

United States District Court,
W. D. Tennessee, W. D.

April 6, 1970.

---

Walter Bailey, Jr., Ratner, Sugarmon, Lucas & Willis, Memphis, Tenn., for original plaintiffs.

Craig Crenshaw, Dept. of Justice, Washington, D. C., for plaintiff-intervenor United States.

R. Lee Winchester, Jr., Memphis, Tenn., for defendant.

## OPINION

BAILEY BROWN, Chief Judge.

This opinion has to do with the plan of desegregation of pupils and faculty of the Shelby County, Tennessee public schools to be placed in effect for the school year 1970–71 and future years. The defendant Shelby County Board of Education operates all public schools in the county that are outside the City of Memphis.

Following the hearing on February 10–12, 1970 on the motion of the original plaintiffs and the Attorney General for further relief, we took the motion under advisement. We did this to give us the opportunity to assimilate the plans tendered and the evidence introduced at

the hearing and, further, because we anticipated an opinion from the Supreme Court in the Memphis School case (Northcross v. Board of Education of Memphis, Tennessee, City Schools, et al.) that would throw additional light on the constitutional obligation of the defendant Board. The opinion of the Supreme Court has since come down. 397 U.S. 232, 90 S.Ct. 891, 25 L.Ed.2d 246 (1970).

Before discussing the evidence introduced at the hearing and the contentions of the parties, we believe it would be well, by way of background, to set out the recent history of this litigation and to discuss the applicable law.

Prior to 1968 the defendant Board had, with a couple of minor exceptions not necessary to note here, been operating for several years under a freedom-of-choice plan of desegregation which had been approved and placed in effect by a consent decree. This plan was considered to be valid under the then generally accepted view of constitutionality, since the plan contained no impermissible racial classification and since any segregation that persisted resulted from voluntary choice or in any event did not result from present State-action. The view of an overwhelming majority of the courts then was that the plaintiffs had sought and that the Supreme Court had required in Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954); 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955) *only* that the States and their educational arms be completely color-blind in the administration of the public schools. (See our discussion of the decisions interpreting the *Brown* opinions in Monroe v. Board of Commissioners, 244 F.Supp. 353, 356 et seq. (W.D.Tenn.1965)).[1]

This view was succinctly summarized by the oft-quoted statement in Briggs v. Elliott, 132 F.Supp. 776, 777 (E.D.S.C. 1955):

"[I]t is important that we point out exactly what the Supreme Court has decided and what it has not decided in this case. It has not decided that the federal courts are to take over or regulate the public schools of the states. It has not decided that the states must mix persons of different races in the schools or must require them to attend schools or must deprive them of the right of choosing the schools they attend. What it has decided, and all that it has decided, is that a state may not deny to any person on account of race the right to attend any school that it maintains."

Following the decisions of the Supreme Court on May 27, 1968 in the *Green, Raney* and *Monroe* cases (391 U.S. 430, 443 and 450, 88 S.Ct. 1689, 1697 and 1700, 20 L.Ed.2d 716, 727, and 733), the original plaintiffs and the Attorney General moved for further relief, contending in substance that the freedom-of-choice plan was not bringing about the degree of racial integration of pupils required by those decisions and further that faculty integration must be accelerated. We thereupon held a hearing on this motion on July 16, 1968, and entered a memorandum decision and order on July 19, 1968. While there is language in the *Green, Raney* and *Monroe* opinions that arguably supports a contrary view,[2] we concluded in our decision that those cases hold that,

1. This view would be correct whether the decision in the *Brown* case was based on a determination that race is an impermissible classification for purposes of assigning pupils to schools or was based on a determination that schools could not be equal where there was *compulsory* segregation because of the adverse effect of such on the Negro children.

2. For example, in *Green*, 391 U.S. at 431, 88 S.Ct. at 1691 it is stated that the issue presented by the plan before the Court was whether the plan "constitutes adequate compliance with the Board's responsibility 'to achieve a system of determining admission to public schools on a nonracial basis * * *.' Brown v. Board of Education * * *"; and at 436, 88 S.Ct. at 1693 it stated that *Brown* "commanded the abolition of dual systems * * *."

at least in States wherein racial segregation was required by law at the time of the *Brown* decision in 1954, integration of pupils was legally required, if feasible, to the extent that the races would be as nearly balanced in each school as in the entire school system.[3] We stated that, to bring about such desegregation, a unitary geographical zone for each school, with very limited transfers, would be required. And while we concluded that, in determining the feasibility of additional integration, the defendant Board could properly consider such factors as capacities and locations of schools, physical boundaries, transportation problems, and cost, we also concluded that such steps as pairing of schools to overcome the effect of segregated neighborhoods might well be feasible and therefore required. Thus our conclusion as to the holding in the *Green, Raney* and *Monroe* cases was that they went considerably beyond the holding in the *Brown* case and that they required that the defendant Board take all feasible steps to maximize racial integration in the schools and to bring about a racial balance in the schools.

By the order entered with our decision on July 19, 1968, supplemented by an order entered on August 15, 1968, it was required: (1) that faculty in grades one through six be integrated in each school in the same proportion, within a tolerance of 10%, as in the system as a whole beginning with the 1968–69 school year and that the same be accomplished in the other grades beginning with the 1969–70 school year; (2) that by January 1, 1969, the defendant Board file a plan for pupil desegregation, to be effective beginning with the 1969–70 school year, whereby, to the

extent feasible, in each school the proportion would be the same, within a tolerance of 10%, as in the system as a whole, and (3) defendant Board was directed to seek the assistance of the Educational Opportunities Planning Center at the University of Tennessee.

Pursuant to this order, the defendant Board submitted a proposed plan, but due to the lateness of the filing of the objections to the plan by the original plaintiffs and the Attorney General, the hearing to consider the plan could not be held until May 12–16, 1969. Following that hearing, we filed an opinion and order on May 26, 1969. As stated in that opinion, it appeared that a great deal more pupil integration would be accomplished by the plan, and it further appeared that the required complete integration of faculty in the elementary schools, though not in the secondary schools, would be accomplished by the defendant Board.[4] We pointed out that faculty integration in the secondary schools had presented a special problem due to the dearth of Negro teachers who were qualified in certain disciplines and the fact that fewer of the Negro pupils than white pupils at the present time opt to take such subjects. We concluded that, since there would be a substantial advance in pupil and faculty integration under the defendant Board's plan and policies in the school year 1969–70, the plan should be approved for that year. However, we concluded that the plan would not, with respect to pupil integration, as a long-term plan meet the requirements of the *Green, Raney* and *Monroe* cases, and we indicated that we would state our reasons for this conclusion in a later addendum to our opinion.

3. There was no suggestion in the *Green* opinion that the choices exercised under the freedom-of-choice plan before the Court were other than free except for the possible effects of habit and history, and yet the Court said, at 441, 88 S.Ct. at 1696 that "the school system remains a dual system. * * * "; and at 442, 88 S.Ct. at 1696 it stated: "The Board must be required to formulate a new plan and,

in light of other courses which appear open to the Board, such as zoning, fashion steps which promise realistically to convert promptly to a system without a 'white' school and a 'Negro' school, but just schools."

4. Under the defendant Board's plan, most schools would have unitary zones but there would be some dual zones.

In the addendum filed on October 1, 1969, we pointed out that under the defendant Board's plan some schools, in areas of heavy concentration of Negro pupils, would remain entirely Negro as a result of the continuation of some dual geographical zoning for whites and Negroes. We said that such dual zones could not be permitted for the reason advanced by the defendant Board, which was that the desired ratio of whites to Negroes (approximately the same 72–28 ratio as in the system as a whole) could not be obtained by unitary geographical zoning. We also said that, contrary to the defendant Board's contention, the fact that most whites would not attend schools which had a majority or a near-majority of Negroes is not a ground for allowing all-Negro schools; we pointed out that, in the *Monroe* case, the Supreme Court specifically held that the fact that whites will not attend is not a proper consideration, from which we concluded that the law requires that we present white pupils and parents in those areas with the options of attending these schools, or moving, or attending private schools. We consequently in the addendum ordered that the defendant Board file still another plan, to be effective with the 1970–71 school year, that would meet the requirements set out in the opinion and order of May 26, 1969 and this addendum thereto.

The defendant Board has appealed from the order of October 1, 1969 and such appeal is now pending.[5] However, pursuant to the order, defendant Board filed a new plan on January 15, 1970, which it tenders as a plan that will comply with the order. Under this plan, all schools would have a unitary zone. The defendant Board has made it clear that it does not recommend the plan, again contending that to the extent the plan will require whites to attend schools with a majority or near-majority of Negroes, it will cause the whites to move or attend private schools and that therefore integration will not actually result. The Educational Opportunities Planning Center has likewise filed a plan which in many respects is the same as the defendant Board's, but there are some differences that we will discuss hereinafter. The Attorney General largely agrees with the plan filed by the Center, though he makes some suggested changes in that plan. The original plaintiffs agree with the Center's plan in all respects as to zones and in almost all other respects.

Since the *Green, Raney* and *Monroe* trilogy was handed down in 1968, the Supreme Court has again spoken on the subject of public school integration. In Alexander v. Holmes County Board of Education, 396 U.S. 19, 90 S.Ct. 29, 24 L.Ed.2d 19 (1969), the Court required the Court of Appeals for the Fifth Circuit to issue an order "declaring that each of the school districts here involved may no longer operate a dual school system based on race or color, and directing that they begin immediately to operate as unitary school systems within which no person is to be effectively excluded from any school because of race or color."

In the City of Memphis case referred to at the beginning of this opinion, our Court of Appeals for the Sixth Circuit, in ruling on the application of the plaintiffs for injunctive relief pending their application to the Supreme Court for certiorari to obtain a review of the court's ruling, said, after citing the *Alexander* case:

"Upon the oral argument of this appeal, we asked counsel for plaintiffs to advise what he considered would be the 'unitary system' that should be forthwith accomplished in Memphis.

5. The original plaintiffs filed a motion, on November 13, 1969, styled "Motion to Require Adoption of Unitary System Now," based on the holding in Alexander v. Holmes County Board of Education, 396 U.S. 19, 90 S.Ct. 29, 24 L.Ed.2d 19 (1969). This Court denied the motion in a memorandum decision and order on December 15, 1969, from which the original plaintiffs appealed but did not perfect their appeal.

He replied that such a system would require that in every public school in Memphis there would have to be 55% Negroes and 45% whites. Departures of 5% to 10% from such rule would be tolerated. The United States Supreme Court has not announced that such a formula is the only way to accomplish a 'unitary system.' We have expressed our own view that such a formula for racial composition of all of today's public schools is not required to meet the requirement of a unitary system. Deal v. Cincinnati Board of Education (Ohio schools), 369 F.2d 55 (6th Cir. 1966), cert. denied, 389 U.S. 847, 88 S.Ct. 39, 19 L. Ed.2d 114 (1967); Mapp v. Board of Education, (Tennessee schools), 373 F.2d 75, 78 (6th Cir. 1967); Goss v. Knoxville Board of Education (Tenn. schools), 406 F.2d 1183 (6th Cir. 1969); Deal v. Cincinnati Board of Education, (Ohio schools) 419 F.2d 1387 (6th Cir. 1969). 420 F.2d 546 (6th Cir. January 12, 1970)."

The Supreme Court granted certiorari in the City of Memphis case and then remanded the case to the District Court to "consider the issues before it and to decide the case consistently with Alexander v. Holmes County Board." In his concurring opinion the Chief Justice said:

"These school cases present widely varying factors: some records reveal plans for desegregating schools, other have none or only partial plans; some records reflect rezoning of school districts, others do not; some use traditional bus transportation such as began with consolidated schools where such transportation was imperative, others use school bus transportation for a different purpose and unrelated to the availability of a school as to which such transportation is not required.

"The suggestion that the Court has not defined a unitary school system is not supportable. In Alexander v. Holmes County Board of Education, 396 U.S. 19, 90 S.Ct. 29, 24 L.Ed.2d 19 (1969), we stated, albeit perhaps too cryptically, that a unitary system was one 'within which no person is to be effectively excluded from any school because of race or color.' From what is now before us in this case it is not clear what issues might be raised or developed on argument, as soon as possible, however, we ought to resolve some of the basic practical problems when they are appropriately presented including whether, as a constitutional matter, any particular racial balance must be achieved in the schools; to what extent school districts and zones may or must be altered as a constitutional matter; to what extent transportation may or must be provided to achieve the ends sought by prior holdings of the Court. Other related issues may emerge." Northcross et al. v. Board of Education of Memphis, Tennessee, City Schools, et al., 397 U.S. 232, 90 S.Ct. 891, 25 L.Ed.2d 246 (1970).

It is apparent that neither our Court of Appeals nor the Chief Justice believes that the Supreme Court has decided that the Constitution requires that a "particular racial balance must be achieved in the schools * * *."

■ Accordingly, our best judgment is that, as of now, a school system that has honestly drawn unitary geographical zone lines, that is, zones not gerrymandered to preserve segregation, and that severely limits transfers as hereinafter provided, is not a "dual system" with respect to pupils.[6] We also should state at this point, and we do not understand the original plaintiffs or the Attorney General to contend to the contrary, that any proposal of the defendant Board that is constitutional

---

6. In the *Monroe* case (391 U.S. 450, 88 S.Ct. 1700, 20 L.Ed.2d 733 (1968)), the Supreme Court struck down a unitary zone plan primarily because of the free transfer provision in the plan.

must be approved.[7] In short, it is not for this court to determine the wisdom or lack of wisdom of a particular proposal of the defendant Board; it is for us to determine only whether or not it is constitutional.

We now turn to the plan tendered by the defendant Board. At the outset, we can state that, with one very minor exception, there is no substantial evidence of gerrymandering in the defendant Board's zone lines. Dr. Myer, who represented the Educational Opportunities Planning Center, testified that he found only the single minor instance of gerrymandering, and there is no proof of gerrymandering to the contrary; no such gerrymandering otherwise appears to the court. The defendant Board, while not agreeing that the zone line referred to was intentionally gerrymandered, offered to correct it as suggested by Dr. Myer. Having said this, we could, on the basis of our conclusion as to the law heretofore stated, simply approve the zones as tendered by the defendant Board. However, we deem it proper to describe the overall result of the defendant Board's zone lines and to discuss in some detail the differences between the Board, the Center and the Attorney General with respect to zones, as well as specifically to approve some suggested changes in the Board's zones that were agreed to by the Board.

With the zone lines as proposed by defendant Board and as amended with its agreement, there will be: (1) only one all-white and one all-Negro school in the system, both of which are elementary schools; (2) ten elementary schools that will have a majority of Negro pupils and eighteen elementary schools that will have a majority of white pupils; and

(3) three secondary schools that will have a majority of Negro pupils and five secondary schools that will have a majority of white pupils.[8]

The defendant Board has accepted the Center's recommendation that Woodstock secondary school be closed and the pupils assigned to Millington Central.[9] The defendant Board has likewise accepted the Center's recommendation that Collierville-Peterson school serve all pupils in a single zone from grade 1 through the highest grade it will accommodate and that the other Collierville school serve the remainder of the grades in that zone. These amendments to the defendant Board's plan are approved.

The defendant Board's plan contemplates the closing of two elementary schools, Capleville 78 and Eads. At the hearing certain citizens, white and Negro, testified in support of their desire to keep these schools open and the Board indicated a willingness to do so. However, since such is not a part of the Board's plan and since keeping these schools open will not promote desegregation, we decline to approve this amendment to the Board's plan.

Under defendant Board's plan, White's Chapel school will have an all-Negro student body and Coro Lake school will have 342 white pupils and 151 Negro pupils. These are elementary schools and are about two miles apart. The Center and the Attorney General propose that these schools be paired in a single geographic zone, assigning the lower elementary grades to one school and the upper elementary grades to the other. If this is done, both schools will have a majority of Negro pupils. However, the Center points out that if cer-

7. However, it is implicit in their proposals that the Attorney General and the original plaintiffs contend that the Constitution requires that all feasible steps be taken to balance the races in each school.

8. The County system lost a large number of white pupils upon the recent annexation of Whitehaven by the City. Now the white pupils in the County system are

fairly heavily concentrated in the area immediately north and northeast of the City.

9. The Attorney General suggests that Woodstock secondary school be kept open and that we add to its "feeder" elementary schools. This would require a substantial improvement in the facility and curriculum.

tain white pupils in the area, who are by contract with the City now attending a City school recently taken over from the County by annexation, are required to attend Coro Lake or White's Chapel, this would place a slight majority of white pupils in both schools. It appears to the Court that the unitary zones as proposed by the defendant Board are not unconstitutional and therefore must be approved. It further appears that, in any case, both of these schools will be taken over by the City in 1971.

The Center and Attorney General likewise propose that E. A. Harrold and Millington Central elementary schools be similarly paired in one unitary zone. Under the defendant Board's plan of a unitary zone for each, Harrold would have 42 white and 250 Negro pupils and Millington Central would have 679 white and 180 Negro pupils. The gerrymandering suggested by Dr. Myer occurred between these zones, and when the zones are corrected as agreed to by the Board, the number of white pupils in Harrold will be increased somewhat. These two unitary zones as so amended are not unconstitutional and must be approved.

The defendant Board proposes that both Barrett's Chapel and Bolton, each with a unitary zone, serve as both an elementary and secondary school. The Center and the Attorney General would have Barrett's Chapel serve only as a secondary school and Bolton only as an elementary school—for one combined zone. Under either arrangement, both schools will have a majority of Negro pupils. Since the Board's proposal is not unconstitutional, it must be approved.

Under the defendant Board's plan, Ellendale elementary would have 240 white and 66 Negro pupils and Shadowlawn elementary would have 37 white and 382 Negro pupils. The Center and

the Attorney General would close Ellendale and transfer the pupils to Shadowlawn, in which case it would still have a substantial majority of Negro pupils.[10] Shadowlawn is about one and one-half miles from Ellendale. Most of the Ellendale pupils live nearby and now walk to the Ellendale school; the building serves as a community center for the Ellendale community. Since the proposal of the Board is not unconstitutional, it must be approved.

The Center and the Attorney General propose to add to the Board's planned zone for Capleville elementary by rezoning pupils living in an area along and on the east side of Highway 78 from the Germantown zone to the Capleville zone. It appears this would increase the number of white pupils in the Capleville school but it would still have a ratio of Negro to white pupils of more than two to one. Since the Board's proposal is not unconstitutional, it must be approved.

The Center would rezone some of the area which is in the defendant Board's zone for the Germantown secondary school and place this area in the Mt. Pisgah secondary school zone. This would improve the ratio of white to Negro pupils in Mt. Pisgah, but it would still have a ratio of about three whites to five Negroes. In any event, since the defendant Board's proposed zones for Germantown secondary and Mt. Pisgah secondary schools are not unconstitutional, they must be approved.

All zones proposed by the defendant Board and not commented upon in this opinion are approved.

■ We approve the proposal of defendant Board to allow any pupil to attend any school where the pupil's parent is employed.

The defendant Board proposes to allow all secondary school pupils who will be in the tenth, eleventh and twelfth

10. The Attorney General also proposes to rezone some white pupils to Shadowlawn from south of Interstate 40, but we consider this to be impracticable and would be reverse gerrymandering in the extreme.

grades next year to continue in their present schools irrespective of the zones in which they live. The argument is that because the study and other activities of the pupils are established in their present schools, it would be an extreme hardship to require them to change schools. The Center agrees with the Board with respect to pupils who will be in the twelfth grade but not as to the others. The Attorney General and the original plaintiffs oppose allowing any secondary school pupils to attend school outside their zones. We accept the evidence and reasoning of the Center on this subject and therefore approve this proposal for, but only for, twelfth grade pupils.

█ The defendant Board may assign special students, such as handicapped students, without respect to unitary zones.

We approve the defendant Board's carrying out its existing contracts with the City with respect to pupils now living in the City continuing in County schools that they had been attending and pupils now living in the County continuing in formerly County schools taken over by the City.

█ The general question of allowing pupils to attend school outside their unitary zones is a difficult one. Even if the approved plan provided that such could be allowed only for valid administrative or educational reasons and not for reasons related to race, it takes no special prescience to foresee that there will be many requests for such transfers and that the ingenuity of the supporting reasons will be impressive. The Superintendent of the County schools foresees that such requests will take a large amount of his time and the time of his staff to resolve.

It therefore appears that the plan should provide that no pupil will be allowed to attend a school outside the zone in which the pupil lives except for valid administrative or educational reasons and then only if the pupil is not by the transfer avoiding a school in which the pupil would be in a racial minority and attending a school in which the pupil would be in a racial majority.

█ The order with respect to integration of elementary school teachers, which has heretofore been complied with, will be continued in effect. However, with respect to secondary school teachers, it will only be required generally that such teachers be employed and discharged without consideration of race and that to the extent feasible, in the light of the qualifications of the teachers and the need for teachers of particular qualifications in the school, such teachers will be assigned and transferred so that the ratio of white to Negro teachers in each school will be, within a tolerance of 10%, the same as in the system as a whole.

The school Board will file notice of all future building plans with the Clerk and furnish counsel for the original plaintiffs and the Attorney General with copies of such notices.

Before closing this opinion, the Court desires to thank Dr. Fred Vendetti and Dr. Marshall E. Myer, Jr. of the Educational Opportunities Planning Center of the University of Tennessee for their work in connection with this case. Their suggestions in conference, testimony in court, and unitary zone plan have been most helpful to the court.

Counsel will prepare an order for entry.