Brenda Kay MONROE, etc., et al.

v.

BOARD OF COMMISSIONERS OF the
CITY OF JACKSON, TENNESSEE,
etc., et al.

Civ. No. 1327.

United States District Court
W. D. Tennessee, E. D.

Aug. 12, 1963.
Addendum Oct. 9, 1963.

Z. Alexander Looby and Avon N. Williams, Jr., Nashville, Tenn., J. Emmett Ballard, Jackson, Tenn., Jack Greenberg, Constance Baker Motley, and James M.

Nabrit, III, New York City, for plaintiffs.

Russell Rice, Jackson, Tenn., for defendants.

BAILEY BROWN, District Judge.

This is a suit filed by certain minors and their parents, all Negroes, seeking desegregation of the public schools of the City of Jackson and Madison County, Tennessee. After disposition of certain preliminary motions, the Court granted plaintiffs' motion for a summary judgment and ordered the two Boards to submit plans for desegregation. The Court has held a hearing on the plan submitted by the City and plaintiffs' objections thereto, and this memorandum decision deals only with the City's proposed plan.

Under the plan submitted by the City Board, grades one through three would be desegregated beginning with the school year 1963–64, grades four through six beginning with the school year 1964–65, and thereafter, starting with the seventh grade, and beginning with the school year 1965–66, one additional grade would be desegregated each year. The plan does not specifically describe the proposed new unitary zones or districts to be applicable to desegregated grades, stating only that they would in due course be established. It developed at the hearing that a map setting out the proposed unitary zones for elementary schools was in existence and had the tentative approval of the City Board. For the reason that a realistic appraisal could not otherwise be made of the plan submitted, the Court asked that the proposed zoning map be placed in evidence, which was done. It appeared that no such map of proposed unitary zones for the junior and senior high schools is now in existence.

Under the proposed plan, all pupils heretofore enrolled would be entitled to attend the school in which they are presently enrolled until they graduate from that school even though they do not live in the unitary zone or district of that school. All pupils entering grades desegregated under the plan would be entitled to attend the school in whose zone they reside, without regard to race and whether or not they were previously enrolled therein, but it is not clear what the priority of the rights would be between such pupils and pupils already attending that school. Pupils entering a desegregated grade for the first time could attend any school they choose provided their choices were approved by the Superintendent. Again, the plan is not altogether clear as to the priority of the rights to attend a particular school between pupils who live in the unitary zone and those who live outside.

Under the plan, general authority is vested in the Superintendent to grant or require transfers with specific standards to be applied, none of which has to do with race or color.

Pupils living outside the city limits may, under the plan, be admitted to the schools provided they accept assignment to schools designated by the Superintendent.

A "Civil Technician Class," which apparently trains pupils to be helpers to civil engineers, would be desegregated beginning in the school year 1963–64.

The specification of objections filed by plaintiffs alleges, in substance, that the proposed plan in no way meets the constitutional requirements established by the School Segregation Cases.

The school system is approximately 40% Negro. There are five elementary schools, two junior high schools and one high school heretofore attended primarily * by white pupils. There are three elementary schools, one junior high and one high school heretofore attended only by Negroes. The total school population is approximately 7900. The homes of Negro pupils are heavily concentrated in certain areas of the city. The faculties are also segregated.

In support of its contention that it needs the time contemplated by the plan submitted, the Board showed by proof

---

\* There has been some voluntary desegregation which will be referred to hereafter.

that a standard achievement test administered to the pupils indicates that there has been little difference in achievement levels between white and Negro pupils in the early grades, but that gradually and by the time the sixth grade is reached, the white pupils have reached an achievement level substantially in advance of the national median and the achievement level of Negro pupils has fallen substantially below the national median. The proof shows that if Negro children were in substantial numbers integrated initially into the upper grades, many of them would not be able to compete and would tend to fall behind, become frustrated, a problem to the school, and finally perhaps drop out of school. It also shows that those who are integrated initially in the lower grades are not as likely to develop this difference in achievement level. Therefore, the Board argues, it is to the interest of both the white and Negro pupils to integrate them initially only in the lower grades as proposed by the Board.

The Board also showed that children of the age of those attending the lower grades are not difficult to handle and to discipline, but that children, upon reaching their early teens, in junior and senior high, frequently tend to resent direction and discipline. Therefore, the Board argues, it would be a mistake to accentuate this problem by requiring the adjustment to integration by white and Negro children for the first time at this difficult age.

The Board also showed that it heretofore voluntarily integrated seven Negro pupils, which action, it argues, is at least some indication of an effort in good faith to comply with the law.

With respect to tangible factors, the proof did not show any substantial difference between the quantity and quality of the buildings, equipment and curricula of the "white" and "Negro" schools but it did show that the faculty in the "white" schools is superior.

The proof showed that both white and Negro children will, where they have a choice, frequently choose to attend a school in which they will be in a majority.

Subsequent to the decision of the Supreme Court holding compulsory segregation in public schools unconstitutional (Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954)), and that desegregation must proceed with all deliberate speed (second Brown opinion, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955)), the Court stated as dicta in Watson v. City of Memphis, 373 U.S. 526, 83 S.Ct. 1314, 10 L.Ed.2d 529 (1963), a holding dealing with desegregation of public parks:

" * * * Given the extended time which has elapsed, it is far from clear that the mandate of the second Brown decision requiring that desegregation proceed with 'all deliberate speed' would today be fully satisfied by types of plans or programs for desegregation of public educational facilities which eight years ago might have been deemed sufficient. Brown never contemplated that the concept of 'deliberate speed' would countenance indefinite delay in elimination of racial barriers in schools, let alone other public facilities not involving the same physical problems or comparable conditions.

- * * * * * *

"Most importantly, of course, it must be recognized that even the delay countenanced by Brown was a necessary, albeit significant, adaptation of the usual principle that any deprivation of constitutional rights calls for prompt rectification. The rights here asserted are, like all such rights, present rights; they are not merely hopes to some future enjoyment of some formalistic constitutional promise. The basic guarantees of our Constitution are warrants for the here and now and, unless there is an overwhelmingly compelling reason, they are to be promptly fulfilled. The second Brown decision is but a narrowly drawn, and carefully limited, qualifi-

cation upon usual precepts of constitutional adjudication and is not to be unnecessarily expanded in application."

Thus it is clear that a gradual plan for desegregation which constituted "all deliberate speed" in 1954 might not satisfy that mandate of the Supreme Court if adopted in 1963.

■ The reason recognized by the law for allowing time for desegregation is the existence of administrative problems (second Brown opinion, supra.) However, if administrative problems exist, the extent to which tangible factors are equal in the Negro and white school systems has been held to be a major consideration in determining how much time should be allowed. Boyce v. Board of Education of Humphreys County, 7 Race Rel.L.Rep. 372, 378 (M.D.Tenn.1961). In determining whether a plan submitted by a school board is offered in a good faith effort to comply with the law, the Court should consider voluntary efforts, if any, to bring the system into compliance. (See, for example, Dove, et al. v. Parham, et al., 181 F.Supp. 504, 513 (E.D.Ark.1960) aff'd 282 F.2d 256 (C.A. 8, 1960).)

■ In taking into account the foregoing considerations, the aim of the Court should be to bring about abolition of discrimination as early as possible consistent with the educational well being of the white and Negro school children. It is with this aim in view that we apply the law to the facts of this case.

While we believe, and so find, that the plan submitted constitutes a good faith effort by the Board to comply with the law, we do not believe that it fully meets the requirement of "all deliberate speed" as contemplated by the language of the Supreme Court in the Watson case, supra.

In terms of numbers, as stated, the ratio of Negro to white pupils is approximately 40–60. This figure is, however, somewhat misleading as a measure of the extent to which integration will actually occur under the proposed plan. Because

the homes of Negro children are concentrated in certain areas of the city, a plan of unitary zoning, even if prepared without consideration of race, will result in a concentration of Negro children in the zones of heretofore "Negro" schools and white children in the zones of heretofore "white" schools. Moreover, this tendency of concentration in schools will be further accentuated by the exercise of choice of schools, even though the provision in the plan with respect to choice is constitutional in that it contemplates voluntary choice and has no reference to race. Therefore, any problems created by the difference in accomplishment levels and the adjustment to attending school with persons of the other race would not be as great as might be anticipated.

■ It therefore seems, and the Court finds, that the following schedule for desegregation would be workable: the first through third grades in the school year 1963–64, the fourth through the sixth grade in the school year 1964–65 (as contemplated by the plan submitted); and the seventh and eighth in 1965–66, the ninth and tenth in 1966–67 and eleventh and twelfth in 1967–68. This schedule would contemplate the completion of the plan in five steps but actually within four years from the present date.

With respect to the grades which have been desegregated under this plan, the Board may adopt any admission or transfer plan as may in its judgment be reasonable or proper, provided, however, that no admission or transfer will be based upon race or have as its purpose the delay of desegregation as contemplated by the plan. It is not necessary otherwise to spell out the rights and duties of the Board in this regard.

The plan also must make it clear that any pupil who resides in a zone established under the plan and who is otherwise entitled under the plan to attend the school for that zone shall have a right to attend that school which is prior to the right of all others who do not live in that zone.

The Court believes that the Board should have administrative discretion in establishing unitary zones, provided that the zones do not clearly thwart the plan to bring about abolition of discrimination. The unitary zones for elementary schools contemplated by the Board (Exhibit 6), the Court believes, do not constitute an abuse of this discretion and are therefore approved. A plan for unitary zones for the junior high system must be submitted by the Board not later than March 1, 1965 and a plan for the senior high schools must be submitted by the Board not later than March 1, 1966.

The plan should provide that pupils who do not live within the city will be admitted or assigned to schools in accordance with the discretion of the Board but, in doing so, no discrimination as to race will be made in admitting or assigning pupils to grades which have then been desegregated under this plan.

The Civil Technicians Class must under the plan, and as contemplated by the Board's plan, be desegregated in the 1963–64 school year. Moreover, the classes for the multiple handicapped and mentally retarded children must be desegregated in the 1963–64 school year if and so long as separate classes and facilities are maintained for these categories of pupils.

An application has been made by plaintiffs for desegregation of teachers, principals and sustaining personnel. In Mapp v. Board of Education of Chattanooga, 319 F.2d 571 (C.A.6, 1963), it was held that Negro pupils and their parents cannot in a class action, as this is, assert the rights of Negro principals and teachers but that they can assert claim to desegregation of teachers and principals as part of their right to an abolition of discrimination in the public schools. This case also held that the pupils and parents have absolutely no right to assert a claim to desegregation of supporting personnel. The judgment should provide that the claim to desegregation of teachers and principals will be held under advisement pending the implementation of the plan, and that the application for desegregation of supporting personnel be stricken.

The judgment should also provide that the Court will retain jurisdiction so long as necessary to effectuate the desegregation of the Jackson city school system as required by the Constitution of the United States.

Plaintiffs and defendant Board will each submit by August 15, 1963, a proposed draft of a judgment consistent with this memorandum decision.

## ADDENDUM

Subsequent to the filing of the foregoing memorandum decision (in lieu of findings and conclusions) and the entry of a judgment based on the decision, the Jackson schools opened for the 1963–64 school year. Thereafter, plaintiffs filed a motion under Rule 60 for "appropriate relief." In this motion, plaintiffs attacked the decision and judgment of the Court, and to this extent the motion was in effect a motion to amend findings and conclusions or for a new trial. Plaintiffs also, in their motion, contended that the defendant Board is not properly applying the plan as approved by the Court. A hearing has been held on the plaintiffs' motion, and this addendum to the original memorandum decision constitutes the Court's ruling on the motion.

Plaintiffs have misconstrued the ruling of the Court in one respect. Under the plan submitted by the defendant Board, pupils would be allowed to continue in the particular school they were attending in 1962–63 until they graduate from that school irrespective of the new unitary zones adopted under the plan. The Court intended to approve, and does approve, this provision so long as pupils who have a right to attend a school by virtue of residing in the new unitary zone of the school would not thereby be deprived of their right to attend. In short, the Court saw good reason for allowing a pupil to continue in the school he has been attending and he should be allowed to do so provided pupils residing in the new unitary zone

of the school have first choice to attend the school. This good reason is the obvious advantage of a continuation in familiar surroundings with the same teachers and fellow students. This provision will, of course, expire by its own terms in a relatively few years.

As heretofore stated, some Negro pupils have been attending "white" schools. The memorandum decision and judgment do not deal with their right to continue to do so. The defendant Board has taken the position that unless these pupils would be entitled to attend the "white" schools under the general provisions of the approved plan, they will be denied this right. Accordingly, the Board has required these Negro pupils to leave the heretofore "white" school system if, but only if, they, at the end of 1962–63 school year, graduated from the school they had been attending. While the overall plan approved by the Court meets, in the Court's opinion, the requirement of "all deliberate speed," at the same time the Court believes and so finds that it should be a part of the plan that Negro pupils already attending school in the "white" school system be allowed to continue to do so.

Plaintiffs seek to have set aside the approval by the Court of the unitary zones for grades one through six as proposed by the defendant Board on the ground that, plaintiffs claim, these zones are gerrymandered to effect a perpetuation of segregation. As heretofore indicated, the Court believes that the school Board should be allowed considerable discretion in establishing unitary zones for attendance and that the action of the Board should not be overridden unless it constitutes a clear abuse of this discretion. Certainly this Court would be entering an administrative thicket if it sought to divide the City into zones and should do so only when the need for such action is clear and plain. The Court does not believe, from the evidence adduced at the trial, that establishment of these zones does constitute an abuse of discretion.

The plaintiffs make more basic attacks on these unitary zones. The proof shows that the residences of the Negroes in Jackson are in substantial part concentrated in certain areas with the result that *de facto* segregation in the school system will be promoted by a geographical zoning system even if it is not gerrymandered. From this the plaintiffs argue that the unitary zones based on residence do not comply with the requirements of the Constitution. First they argue that the School Segregation Cases require integration of white and Negro pupils rather than an abolition of compulsory segregation based on race. Secondly they argue that, even if the School Segregation Cases require only an abolition of discrimination, a right to attend schools based on residence zones is in substance a right to attend based on race.

Plaintiffs make these same attacks on the provision in the plan whereby pupils are allowed, within the limitation heretofore described, to continue in the particular school now attended until graduation. This, plaintiffs argue, promotes *de facto* segregation, and therefore runs counter to the claimed mandate of the School Segregation Cases to effect integration. Plaintiffs also argue that this provision amounts to a recognition of racial factors with respect to admissions and transfers in view of the prior history of the operation in Jackson of segregated schools

With respect to the contention that the law requires more than an abolition of compulsory segregation based on race and that it sets up an affirmative duty to bring about integration, this Court heretofore had occasion to point out in the Obion County, Tennessee, school case, Vick v. County Board of Education of Obion County, 205 F.Supp. 436, 7 R.Rel.Rep. 380 (WD Tenn.1962) that the language of the Supreme Court in the leading cases of Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873, (1954) and 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955), and

Cooper v. Aaron, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1958) does not support this contention.

It can, of course, be argued that the decision of the Supreme Court in the Brown case is based primarily on a finding that separate facilities for the two races cannot be equal because of the adverse psychological and sociological effect of such segregation on the children. See Blaustein & Ferguson, Desegregation and the Law, (Vintage, 2d Rev.Ed.1962), Chapters 9 and 10. From this it can be argued that even if *de facto* racial segregation results from voluntary choice or from consideration of factors other than race, the law requires that it be ended in order to bring about equality of educational opportunity. (It should be pointed out, in passing, that the view that the Supreme Court's decision is based on findings of fact also can plausibly support the argument that in each school desegregation case a separate inquiry must be made as to the effect of segregation on school children in that community. This was the holding in the case of Stell, et al. v. Savannah-Chatham County Board of Education, et al., 220 F.Supp. 667 (S.D.Ga.1963), which decision appears to have been reversed. 318 F.2d 425 (CA 5, 1963).) However, even conceding that the Supreme Court's decision in the Brown case is primarily based on such a finding of fact, the finding of fact was not that segregation *per se* has a detrimental effect on children but rather the finding was that *compulsory segregation based on race* has such an effect. Moreover, even if the Supreme Court did reach the conclusion, based on the record, that racial segregation did *per se* have this adverse effect on the children, it is difficult to see how it could have declared all racial segregation in the schools unconstitutional because presumably voluntary segregation cannot be said to result from "state action." Accordingly, it does not follow that the Supreme Court's decision in the Brown case commands integration rather than an abolition of compulsory segregation based on race even if it be considered to be grounded primarily on a finding of fact.

There remains to be dealt with the argument of plaintiffs to the effect that in the factual context here existing the admission of children into schools according to their residence locations and allowing them to continue in the particular school heretofore attended until graduation amounts to compulsory segregation because of race or in any event amounts to a consideration of racial factors in admissions and transfers.

■ There is nothing in the Brown decision or in other Supreme Court decisions in this field or in the decisions of the Court of Appeals for this Circuit which indicates that school attendance cannot be based on neighborhood zoning. In one case (Northcross, et al. v. Board of Education of the Memphis City Schools, et al., 302 F.2d 818 (CA 6, 1962), cert. den. 370 U.S. 944, 82 S.Ct. 1586, 8 L.Ed.2d 810 (1962)) our Court of Appeals said at page 823:

"Minimal requirements for nonracial schools are geographic zoning, according to the capacity and facilities of the buildings and admission to a school according to residence as a matter of right."

If Negro residences tend to be concentrated in certain areas because of illegal pressure or compulsion, certainly the remedy for this is not to upset the system of neighborhood public schools.

The holding in the case of Goss v. Board of Education of Knoxville and Maxwell v. County Board of Education of Davidson County, Tennessee, 373 U.S. 683, 83 S.Ct. 1405, 10 L.Ed.2d 632 (1963) does not support plaintiffs' contention that allowing pupils to continue in their particular schools until graduation is an unconstitutional consideration of racial factors in the admission and transfer of pupils. This Court approved this provision in the plan, as amended by this Court, for good reasons, herein indicated, having nothing to do with race. This provision applies equally to white and Negro pupils, contemplates a voluntary

decision on the part of pupils and parents involved, and applies regardless of the racial composition of the school in which a pupil would continue until graduation.

Concurrently with the filing of this addendum the Court is entering an order on plaintiffs' motion under Rule 60.