**Brenda K. MONROE et al., Plaintiffs-Appellants,**

v.

**BOARD OF COMMISSIONERS, CITY OF JACKSON, TENNESSEE, et al., and County Board of Education, Madison County, Tennessee, et al., Defendants-Appellees.**

**Nos. 17118, 17119.**

United States Court of Appeals
Sixth Circuit.

July 21, 1967.

Z. Alexander Looby, Nashville, Tenn. (Jack Greenberg, James M. Nabrit, III, and Michael Meltsner, New York City, Gerald A. Smith, Baltimore, Md., and Avon N. Williams, Jr., Nashville, Tenn., on the brief), for appellants.

Russell Rice, Jackson, Tenn., for Board of Com'rs of City of Jackson and others.

Jack Manhein, Sr., Jackson, Tenn., for County Board of Education of Madison County and others.

Before O'SULLIVAN, PHILLIPS and PECK, Circuit Judges.

O'SULLIVAN, Circuit Judge.

In 1963 a suit was filed by Brenda K. Monroe and others, Negro children and their parents, to bring about the desegregation of the public schools of the City of Jackson, and of Madison County, Tennessee.[1]

The District Court required the school authorities to submit plans to accomplish desegregation and ultimately granted the relief sought by approving parts of a submitted plan and ordering other steps to be taken. Separate opinions were written, one involving the City of Jackson schools, reported as Monroe v. Board of Commissioners of the City of Jackson, Tennessee, et al., 221 F.Supp. 968 (W.D. Tenn.1963) and the other relating to Madison County schools, reported in Monroe v. Board of Commissioners, etc., et al., 229 F.Supp. 580 (W.D.Tenn. 1964). Appeals to this Court from these cases were dismissed by agreement. Obedient to the above decisions, all grades of the schools involved have been desegregated.

The litigation with which we now deal arises from Motions for Further Relief filed in the District Court by plaintiffs. By these motions, plaintiffs sought to accomplish greater integration of the school children, desegregation of the teaching staffs, and the enjoining of described practices of the school authorities which were alleged to be violative of the District Judge's original decrees and contrary to new developments in the law. The District Judge, again, dealt separately with the city and the county schools in disposing of the Motions for Further Relief. His decision as to the city schools is reported in Monroe v. Board of Commissioners, City of Jackson, 244 F.Supp. 353 (W.D.Tenn.1965) and as to the County Schools in Monroe v. Board of Education, Madison County, Tennessee, et al., 269 F.Supp. 758 (W.D. Tenn.1965). These are the cases before us on this appeal; the plaintiffs are the appellants. These opinions, with the earlier ones reported at 221 F.Supp. 968 and 229 F.Supp. 580, supra, set out the facts and we will restate them only where needed to discuss the present contentions of the plaintiffs-appellants.

1) *Compulsory integration.*

Appellants argue that the courts must now, by reconsidering the implications of the Brown v. Board of Education decisions in 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) and 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955), and upon their own evaluation of the commands of the Fourteenth Amendment, require school authorities to take affirmative steps to eradicate that racial imbalance in their schools which is the product of the residential pattern of the Negro and white neighborhoods. The District Judge's opinion discusses pertinent authorities and concludes that the Fourteenth Amendment did not command compulsory integration of all of the schools regardless of an honestly composed unitary neighborhood system and a freedom of choice plan. We agree with his conclusion. We have so recently expressed our like view in Deal et al. v. Cincinnati Board of Education, 369 F.2d 55 (CA 6, 1966), petition for cert. filed, 35 LW 3394 (U.S. May 5, 1967) (No. 1358), that we will not here repeat Chief Judge Weick's careful exposition of the relevant law of this and other circuits. He concluded "We read *Brown* as prohibiting only enforced segregation." 369 F.2d at 60. We are at once aware that we were there dealing with the Cincinnati schools which had been desegregated long before *Brown*, whereas we consider here Tennessee schools desegregated only after and in obedience to *Brown*. We are not persuaded, however, that we should devise a mathematical rule that will impose a different and more stringent duty upon states which, prior to *Brown*, maintained a de jure biracial school system, than upon those in which the racial imbalance in its schools has come about from so-called

1. The City of Jackson is located in Madison County and the respective school authorities are the board of Commissioners of the City of Jackson and the County Board of Education of Madison County.

de facto segregation—this to be true even though the current problem be the same in each state.

We are asked to follow United States v. Jefferson County Board of Education, 372 F.2d 836 (CA 5, 1966), which seems to hold that the pre-*Brown* biracial states must obey a different rule than those which desegregated earlier or never did segregate. This decision decrees a dramatic writ calling for mandatory and immediate integration. In so doing, it distinguished Bell v. School City of Gary, Indiana, 324 F.2d 209 (CA 7, 1963), cert. den. 377 U.S. 924, 84 S.Ct. 1223, 12 L.Ed. 2d 216, on the ground that no pre-*Brown* de jure segregation had existed in the City of Gary, Indiana. 372 F.2d at 873. It would probably find like distinction in our *Deal* decision because of Cincinnati's long ago desegregation of its schools. We, however, have applied the rule of *Deal* to the schools of Tennessee. In Mapp v. Board of Education, 373 F.2d 75, 78 (CA 6, 1967) Judge Weick said,

"To the extent that plaintiffs' contention is based on the assumption that the School Board is under a constitutional duty to balance the races in the school system in conformity with some mathematical formula, it is in conflict with our recent decision in Deal v. Cincinnati Board of Education, 369 F.2d 55 (6th Cir. 1966)."

However ugly and evil the biracial school systems appear in contemporary thinking, they were, as *Jefferson,* supra, concedes, de jure and were once found lawful in Plessy v. Ferguson, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (1896), and such was the law for 58 years thereafter. To apply a disparate rule because these early systems are now forbidden by *Brown* would be in the nature of imposing a judicial Bill of Attainder. Such proscriptions are forbidden to the legislatures of the states and the nation—U.S. Const. Art. I, Section 9, Clause 3 and Section 10, Clause 1. Neither, in our view, would such decrees comport with our current views of equal treatment before the law.

This is not to say that Tennessee school authorities can dishonestly construct or deliberately contrive a system for the purpose of perpetuating a "maximum amount" of its pre-*Brown* segregation. Northcross v. Board of Education of City of Memphis, 333 F.2d 661, 664 (CA 6, 1964). But to the extent that United States v. Jefferson County Board of Education, and the decisions reviewed therein, are factually analogous and express a rule of law contrary to our view herein and in *Deal,* we respectfully decline to follow them.

2) *Gerrymandering.*

■ Appellants assert that while giving surface obedience to the establishment of a unitary zoning system and freedom of choice, the school officials of the City of Jackson had been guilty of "gerrymandering" in order "to preserve a maximum amount of segregation." Were this true, it would be violative of the law. Northcross v. Board of Education of City of Memphis, 302 F.2d 818, 823 (CA 6, 1962), cert. den. 370 U.S. 944, 82 S.Ct. 1586, 8 L.Ed.2d 810, and Northcross v. Board of Education of City of Memphis, 333 F.2d 661, 664 (CA 6, 1964). The District Judge in the instant matter did hold that as to some boundary lines "there appears to be gerrymandering." Monroe v. Board of Commissioners, City of Jackson, supra, 244 F.Supp. at 361. As to these instances, he ordered changes in the school zone lines. Id. at 361, 362. But, as to the junior high schools, he concluded,

"that the proposed junior high school zones proposed by defendants do not amount to unconstitutional gerrymandering." 244 F.Supp. at 362.

Without making our own recitation of the relevant evidence, we express our agreement with the District Judge.

3) *Faculty desegregation.*

In the accomplishment of desegregation in the involved schools, there remain some that are attended only by Negro and others only by white children. The teaching staff conforms substantially to this pattern—all Negro teachers in the

all Negro schools and all white teachers in the all white schools. Little attention was paid to the teaching staff in the early desegregation cases. Brown v. Board of Education, supra, did not speak on it, nor did the early relevant decisions from this circuit. In Mapp v. Board of Education of Chattanooga, 319 F.2d 571, 576 (CA 6, 1963), however, we ordered restored to the complaint there involved allegations and prayers for relief relating to assignment of teachers and principals, but ordered also that "decision of the legal question presented await development in the progress of the plan approved." 319 F.2d at 576. And we further concluded that "[w]ithin his discretion, the District Judge may determine when, if at all, it becomes necessary to give consideration to the question * * *." Id.

This leisurely postponement of consideration of faculty desegregation appealed to the Fourth Circuit, when in Bradley v. School Board of City of Richmond, Virginia, 345 F.2d 310, 320, 321 (CA 4, 1965), it said:

"The possible relation of a reassignment of teachers to protection of the constitutional rights of pupils need not be determined when it is speculative. When all direct discrimination in the assignment of pupils has been eliminated, assignment of teachers may be expected to follow the racial patterns established in the schools. An earlier judicial requirement of general reassignment of all teaching and administrative personnel need not be considered until the possible detrimental effects of such an order upon the administration of the schools and the efficiency of their staffs can be appraised along with the need for such an order in aid of protection of the constitutional rights of pupils."

But the Supreme Court declared this would not do, and in Bradley v. School Board, 382 U.S. 103, 86 S.Ct. 224, 15 L.Ed.2d 187 (1965), remanded the case to require the Richmond School Board to proceed with study and resolution of the faculty integration question, stating,

"There is no merit to the suggestion that the relation between faculty allocation on an alleged racial basis and the adequacy of the desegregation plans is entirely speculative." 382 U.S. at 105, 86 S.Ct. at 225.

The *Bradley* opinion was followed by Rogers v. Paul, 382 U.S. 198, 86 S.Ct. 358, 15 L.Ed.2d 265 (1965); once again the Supreme Court remanded the cause for consideration of the faculty desegregation problem.

The District Judge in the matter now before us did hear some evidence on the question of faculty desegregation and concluded,

"We do not believe that the proof of the plaintiffs is sufficiently strong to entitle them to an order requiring integration of the faculties and principals." 244 F.Supp. at 364.

He did, however, attack a then current policy of the school authorities whereby white teachers and Negro teachers, "simply because of their race," were respectively assigned only to schools whose pupils were all or predominantly of that teacher's race. The order implementing his decision contained the following:

"The application of plaintiffs for an order requiring integration of faculty is at this time denied. However, the policy of defendants of assigning white teachers only to schools in which the pupils are all or predominantly white and Negro teachers only to schools in which the pupils are all Negro is by this order rescinded to the extent that white teachers, who so desire, will not be barred from teaching in schools in which the pupils are all or predominantly Negro, and Negro teachers, who so desire, will not be barred from teaching in schools in which the pupils are all or predominantly white.

To implement this change in policy, defendants must forthwith, as to substitute teachers, and each year beginning with the year 1966–67, as to all teachers, publicize it and obtain from each teacher an indication of willingness or an indication of objection to

teaching in a school in which the pupils are all or predominantly of the other race. All teachers who indicate such a willingness will be assigned to schools without consideration of the race of the teacher or the pupils, but all other usual factors may be considered in assigning teachers. Nothing in this order, however, will be construed as requiring the assignment of an objecting teacher to a school in which the pupils are all or predominantly of the other race or will be construed as requiring a refusal to employ or a dismissal of a teacher who objects to teaching in such a school. This change in policy will be effective as to substitute teachers during the remainder of the school year 1965–66 and as to all teachers beginning with the school year 1966–67."

We note that this order was handed down before Bradley v. School Bd., supra, and we are constrained to hold that it does not commit or require the school authorities to adopt an adequate program of faculty desegregation which will pass

muster under the implied command of the *Bradley* case. Whatever *Bradley's* clear language, we cannot read it otherwise than as forbidding laissez faire handling of faculty desegregation. It implies that the accomplishment of that goal cannot be left to the free choice of the teachers and that the Board must exercise its authority in making faculty assignments so as to assist in bringing to fruition the predicted benefits of school desegregation.

No Supreme Court decision, however, has as yet provided a blue print that will achieve faculty desegregation. The United States Office of Education has indicated that, in some affirmative way, school boards must act to correct past discriminatory practices in the assignment of teachers.[2] But its recommendations do not have the force of law; neither does it provide clear guidelines to make easy the job of school boards in dealing with this problem. It will be difficult to eliminate the forcing of people into places and positions because of race and at the same time compulsorily assign a

---

2. "§ 181.13 Faculty and Staff

(a) *Desegregation of Staff.* The racial composition of the professional staff of a school system, and of the schools in the system, must be considered in determining whether students are subjected to discrimination in educational programs. Each school system is responsible for correcting the effects of all past discriminatory practices in the assignment of teachers and other professional staff.

(b) *New assignments.* Race, color, or national origin may not be a factor in the hiring or assignment to schools or within schools of teachers and other professional staff, including student teachers and staff serving two or more schools, except to correct the effects of past discriminatory assignments.

\* \* \* \* \*

(d) *Past assignments.* The pattern of assignment of teachers and other professional staff among the various schools of a system may not be such that schools are identifiable as intended for students of a particular race, color, or national origin, or such that teachers or other professional staff of a particular race are concentrated in those schools where all, or the majority, of the students are of that race. Each school system has a

positive duty to make staff assignments and reassignments necessary to eliminate past discriminatory assignment patterns. Staff desegregation for the 1966–67 school year must include significant progress beyond what was accomplished for the 1965–66 school year in the desegregation of teachers assigned to schools on a regular full-time basis. Patterns of staff assignment to initiate staff desegregation might include, for example: (1) Some desegregation of professional staff in each school in the system, (2) the assignment of a significant portion of the professional staff of each race to particular schools in the system where their race is a minority and where special staff training programs are established to help with the process of staff desegregation, (3) the assignment of a significant portion of the staff on a desegregated basis to those schools in which the student body is desegregated, (4) the reassignment of the staff, of schools being closed to other schools in the system where their race is a minority, or (5) an alternative pattern of assignment which will make comparable progress in bringing about staff desegregation successfully.

school teacher on the basis of his or her race.

■ It is sufficient for us to say now that the formula announced by the District Judge, leaving the decision of integration of the faculties to the voluntary choice of the teachers, does not obey current judicial commands. We, therefore, remand this phase of the litigation to the District Judge to reconsider upon a further evidentiary hearing the matter of faculty desegregation.

4) *Desegregation of Teachers Organizations.*

It appears that at the time of the hearing in the District Court there existed in Tennessee two voluntary organizations, the Tennessee Education Association, whose membership was confined to white teachers, and the Tennessee Education Congress, made up of Negro teachers. Traditionally, the School Board allowed separate holidays to permit the members of these organizations to attend so-called "teacher in-training" programs. The District Judge dealt with this subject as follows:

"Plaintiffs also seek an order prohibiting segregation of teacher in-service training. Although the proof is not completely clear, it appears that the only such segregation that remains results from the fact that the white teachers and the Negro teachers are members of separate professional organizations. It appears without dispute that defendants do not control the policies of these organizations. In any event, as heretofore indicated, the Mapp case, supra, holds that plaintiffs have no standing to assert any constitutional claims that the teachers may have and may assert a claim for teacher desegregation only in support of their constitutional right, as pupils, to an abolition of discrmination based on race. The assertion by plaintiffs that what remains of segregation in teacher in-service training has an effect on their right as pupils is, on the proof in this case extremely tenuous. We deny this application for relief." 244 F. Supp. at 365.

■ The evidence on this subject is too meager to permit us to evaluate the extent to which the school authorities participated in or aided the activities of these separate teacher organizations, and the degree to which membership by the teachers in them would, in turn, affect the rights of the pupils. It appears, however, that these in-service training programs for teachers are conducted pursuant to state law, and are financed with public funds.[3] We make clear that the plaintiff pupils do have standing to assert that the existence of separate teacher organizations based on race and the school authorities' cooperation with their separated activities such as the in-training program "impairs the students' rights to an education free from any consideration of race." Mapp v. Board of Education of Chattanooga, supra, 319 F.2d at 576. If the District Judge's above quoted language can be read as a contrary holding, it is error. We also remand this issue to the District Judge for further consideration.

5) *The Jackson Symphony Orchestra.*

It appeared that the Jackson Symphony Association, with permission of the school authorities, arranged for a program by the Jackson Symphony Orchestra at one of the Jackson schools. The ladies in charge of this event invited the children in several grades of the Jackson City Schools, the County schools, and the Catholic schools. Those students included some from the all-white schools, and some from the schools, public and parochial, containing both Negro and white students. Students in all-Negro schools were not invited for the two performances involved. Testimony by one of the ladies of the Symphony Association denied any discriminatory motivation in the selection of the pupils, suggesting that the capacity of the auditorium was exhausted by those invited and in attendance. She said,

3. See e. g., Chap. 76 Tenn. Public Acts, 1965, Sec. 24.

"If we had room, we would have had every child in town there—fourth, fifth and sixth grades of every school, but we didn't have room."

The school authorities had nothing to do with the matter of who was to be chosen to attend the concert. Its only participation was to allow the use of the auditorium. While it would be impermissible for school authorities to allow use of school facilities for entertainment that was discriminatory, nothing was developed by the evidence to cause us to criticize the District Judge's conclusion that the "defendants were not motivated by racial considerations" in their handling of this matter. Monroe v. Board of Commissioners, supra, 244 F.Supp. at 365.

Another issue discussed by the District Judge, 269 F.Supp. at 759, the so-called "split season," has been rendered moot by the elimination of the practice.

The cause is remanded to the District Judge for further consideration of the matter of faculty desegregation and teacher in-service training, and is otherwise affirmed.