**UNITED STATES of America,
Plaintiff,**

v.

**HAYWOOD COUNTY BOARD OF EDUCATION, Brownsville City Board of Education, City of Brownsville, Tennessee, and Haywood County, Tennessee, Defendants.**

**No. C–67–30.**

United States District Court
W. D. Tennessee, W. D.

Aug. 4, 1967.

Ramsey Clark, Atty. Gen., John Doar, Asst. Atty. Gen., Thomas L. Robinson, U. S. Atty., Maceo W. Hubbard, Patrick Hardin, Joe A. Cannon, Robert T. Moore, Attys., Dept. of Justice, for United States of America.

Lyle Reid, Brownsville, Tenn., for Haywood County, Tenn., and Haywood County Board of Education.

John W. Norris, Brownsville, Tenn., for City of Brownsville, Tenn., and Brownsville City Board of Education.

## MEMORANDUM DECISION

### BAILEY BROWN, Chief Judge.

This is an action brought by the Attorney General of the United States pursuant to authority granted by the Civil Rights Act of 1964 (42 U.S.C. § 2000c–6) against the boards of education of Haywood County and Brownsville, Tennessee and against the County and the City. Brownsville is the county seat of Haywood County. Beginning with the school year 1965–66, the City and County have operated under a freedom of choice plan for desegregation of their schools, and the Attorney General, contending that Negroes are being denied equal protection of the laws, in this action seeks to have this plan abolished and further seeks the desegregation of faculty, supporting personnel and all school-related activities. The parties have filed numerous stipulations, and a plenary hearing has been held, following which the Court took the matter under advisement.

There is a total of about 4000 Negro pupils and 2000 white pupils in the two school systems. Prior to 1965–66, the schools were completely segregated with respect to pupils, teachers and other personnel.

The City, which is a special school district coextensive with its boundaries, operates only two schools, Haywood Elementary (grades 1–3) and Anderson Grammar (grades 4–8). Haywood Elementary was built by the County and is owned by the County Board, but is operated by the City Board under a contract whereby pupils living outside the City may attend its two schools. Both of these schools had only white pupils prior to 1965–66; their student bodies were made up of all of the white elementary pupils living in the City plus those white pupils living outside who chose to attend.

There are only two high schools in the County, Haywood and Carver, both of which are located within the City; prior to 1965–66, Haywood was all white and Carver was all Negro; together they provide all secondary education for pupils living in Haywood County. The County also operates elementary (grades 1–8) schools, all located outside the City limits [1], as follows: eight for white pupils, and as of now, sixteen for Negro pupils.[2] All Negro elementary school pupils attended County schools prior to 1965–66.

Following the enactment of the Civil Rights Act of 1964, both the City and County adopted freedom of choice plans for desegregation of pupils. Under this plan, all pupils, Negro and white, whether they live inside the City, are entitled to choose to attend any school whether it is operated by the City or County. Pursuant to the plan, notices have been run in the local newspaper and also sent to parents of pupils. As a result of the introduction of this plan, the following desegregation has taken place: in 1965–66, twenty-nine Negroes attended Haywood Elementary and Anderson Grammar and forty-one attended Haywood High; in 1966–67, thirty-two Negroes attended Haywood Elementary and Anderson Grammar and forty-seven attended Haywood High; for 1967–68, forty-two Negroes have chosen to attend Haywood Elementary and Anderson Gram-

1. One of them, East Side, adjoins the City limits.

2. The County Board, since around 1960, has been closing the more inadequate Negro elementary school buildings. The number has been reduced from thirty-two since the end of the 1964–65 school year.

mar and thirty-six have chosen to attend Haywood High. No Negroes have attended or chosen to attend any other schools attended by whites, and no white pupils have attended or chosen to attend any schools attended predominantly by Negroes. The faculties remain segregated.

Based on evidence of inadequate buildings and facilities, improper personal notices with respect to the freedom to choose schools, and intimidation of Negro pupils and their parents, the Attorney General has asked for a large measure of relief. It should further be said that, in seeking such relief, the Attorney General also asserts the legal proposition that the law requires integration rather than abolition of State-imposed segregation based on race; that is to say, it is the insistence of the Attorney General that integration is the legally required end-result of any plan of desegregation. The specific relief sought by the Attorney General is described in his post-trial brief and is set out in his proposed decree.

With respect to "immediate relief," effective for the school year 1967–68, the Attorney General seeks the following:

1. The City school system be dissolved and all its assets and liabilities transferred to the County Board.

2. Eight specified elementary schools operated by the County and attended only by Negroes be closed and their pupils transferred to specified all-white elementary schools which are operated by the County and to Haywood Elementary and Anderson Grammar.

3. Assign all other pupils on the basis of choice heretofore indicated.

4. Assign at least thirty-four teachers to schools in which they would be in a racial minority, in part specifying the schools, and require that race not be a factor in the hiring, assignment, promotion, demotion, retention and dismissal of teachers and other professional staff except to "[correct] the effect of the past segregated assignment of faculty and staff."

With respect to "future relief," the Attorney General seeks the following:

1. Commencing with the 1969–70 school year, require that the pattern of assignment of teachers be such that no school would be identifiable as intended for pupils of a particular race.

2. Require that the services of the Tennessee Department of Education be obtained to make a comprehensive study of the facilities with the objective of devising a master plan for building expansion and consolidation which will result in a unitary integrated school system embracing the whole County, to be submitted to the Court for approval, and placed in effect by 1969–70.

3. Create a unitary geographic school zone for each elementary school effective in 1968–69.

4. Require that either Haywood High or Carver High become a County-wide junior high for both races and the other be a County-wide high school for both races, effective in 1968–69.

As stated, the Attorney General, in support of his claims for relief, not only relies on certain factual propositions heretofore alluded to, but also relies on the asserted legal proposition that the law requires integration as an end-result of any plan for desegregation. As he states in his brief: "Freedom of choice is not a goal in and of itself. * * * A plan based on this concept of choice is merely one means to a constitutionally required end—the abolition of school segregation and the eradication of its effects. If this means proves effective in reaching the objective, it is acceptable, but if it fails to undo segregation, other means must be used to achieve the end." This Court has discussed this legal question on at least two prior occasions: Vick et al. v. County Board of Education of Obion County, Tennessee, D.C., 205 F. Supp. 436 (1962); and Monroe v. Board of Commissioners, City of Jackson, Tennessee, D.C., 244 F.Supp. 353 (1965). We concluded that, in its decisions in the School Segregation Cases, the Supreme Court held that race is a constitutionally

impermissible classification with respect to assignment of pupils to schools. We also concluded that, even if these decisions are alternatively based on a finding that segregation has a harmful effect, it is not segregation *per se* that was found to have this effect, but rather it is State-imposed segregation. In support of this conclusion, we cited, among other decisions, the opinion of our Court of Appeals in Kelley et al. v. Board of Education of the City of Nashville, 6 Cir., 270 F.2d 209, 229 (1959). Since then, our Court of Appeals has three times reaffirmed the view that the Constitution does not command integration. Deal et al. v. Cincinnati Board of Education, 6 Cir., 369 F.2d 55, 58–60 (1966); Mapp v. Board of Education of City of Chattanooga, 6 Cir., 373 F.2d 75, 78 (1967); Monroe v. Board of Commissioners of City of Jackson, Tennessee, 6 Cir., 380 F.2d 955 (decided July 21, 1967). In this last opinion, our Court of Appeals respectfully declined the invitation to follow the decision of the Fifth Circuit in United States v. Jefferson County Board of Education, 5 Cir., 372 F.2d 836 (1966) and " * * hold that the pre-*Brown biracial* states must obey a different rule than those which desegregated earlier or never did segregate."

At the hearing, the Attorney General offered evidence of public Klan meetings, bombings and arson of Negro homes, cross burnings, and threatening telephone calls and letters in support of his factual contention that Negroes are afraid to exercise the choice to attend schools with whites. Some Negro witnesses affirmed this fear. He also pointed out that in 1960 it was necessary for the Government to go to court and obtain an injunction to secure voting rights for Negro citizens in Haywood County. United States v. Beaty, 288 F.2d 653 (6th Cir. 1961). To counter this evidence, the defendants: showed that there have been only two public Klan meetings in recent years in Haywood County, apparently organized by outsiders, and that on the day that one of these meetings was held on the Brownsville town square, the Negroes also later held a civil rights demonstration on the square (referred to in the record as the "day of the double-header"); showed that in spite of thorough investigation by the F.B.I., no instance of bombing or arson or cross burning had been shown to be attributable to resistance to school desegregation and that no indictments have resulted (e. g. that the same night that the home of a Negro civil rights leader was bombed, the place of business of a white man, not connected with civil rights, was also bombed, that following the burning of a Negro's home, there was a criminal conviction for arson to collect insurance money, and that one instance of cross burning was carried out by teenagers); and showed that the letters and telephone calls, from an unknown source, were few and far between. The defendants sought to show, on the contrary, that at least most of the incidents upon which the Attorney General relies were coincidental with and were brought about by the fact that two civil rights workers, a young white man and woman, unmarried, were living at the same time in the homes of Negroes, a state of affairs which received the violent disapproval of the people of Haywood County. We would doubt that such an impression of marital bliss without benefit of clergy would itself outrage the people of the County to that great an extent; on the contrary, if these incidents were the result of such outrage, the outrage was caused by the fact that these people were white civil rights workers who were living in the homes of Negroes.

■ We admitted this evidence of these incidents on the theory that a freedom of choice plan is constitutional only if, in its actual operation, the Negro pupils and their parents are truly free to choose to attend schools with whites and that it is immaterial from whence the pressure comes that prevents the choice from being free. We even allowed Negro parents and pupils to testify as to incidents about which they had only heard on the theory that their state of

# 464

mind was itself a relevant fact. We have expressed this general view of the law in the *Vick* case, supra, 205 F.Supp. at page 440, relying on the opinion of our Court of Appeals in the *Kelley* case, supra, in which the Court said, 270 F.2d at page 229: "In common justice, the choice should be a free choice, uninfluenced by fear of injury, physical or economic, or by anxieties on the part of a child or his parents." However, in the more recent *Deal* case, supra, our Court of Appeals said, 369 F.2d at page 59:

> "Appellants, however, argue that the state must take affirmative steps to balance the schools to counteract the variety of private pressures that now operate to restrict the range of choices presented to each school child. Such a theory of constitutional duty would destroy the well-settled principle that the Fourteenth Amendment governs only state action. Under such a theory, all action would be state action, either because the state itself had moved directly, or because some private person had acted and thereby created the supposed duty of the state to counteract any consequences."

Even were we not faced with the foregoing statement in *Deal*, it would still be difficult to determine what effect should be given to a showing that at least some Negro parents and pupils, because of fear, did not make a free choice. This Court indicated in our opinion in the *Vick* case, supra, 205 F.Supp. at page 440, that the circumstances could be such that it would be necessary to abolish a plan for choosing schools. To take this action, that is, establish unitary geographic zones and allow few if any transfers, would mean, of course, that all Negroes in the County would be forced to go to schools with white pupils and vice versa. In a large part of the County the ratio of Negroes to whites runs from 82 to 18 up beyond 91 to 9; it is the opinion of the Chairman of the County Board of Education that if freedom of choice were abolished and such unitary zones established, the whites with children of school age would simply move

out and there would still be no integration in the schools there.

However, and aside from the statement in the *Deal* opinion that the existence of "private pressures" does not require forced integration, we believe from the proof that the incidents of violence that have occurred are disapproved by the vast majority of the white citizens of Haywood County and are certainly disapproved by the community leaders. Negroes for some time have freely voted. They have confidence in their present Sheriff and believe he will enforce the law without consideration of race. There is a great need in the County for new jobs because of the effect of mechanization of agriculture and certain federal farm programs. In response, the business leaders have obtained new industries and are avidly seeking more. Negroes are obtaining industrial jobs and are being hired on an equal basis with whites. The biracial committee which is concerned with the federal poverty program is operating effectively and cooperates in the handling of any complaint as to denial of equal opportunities. In short, while Haywood County has had some shameful incidents in its past history, the situation is improving and we believe, from the evidence, will continue to improve.

■ We therefore conclude that under the law and under the facts of this case it would not be proper to require abolition of the freedom of choice plan.

The evidence shows that the personal written notices to Negro parents and pupils have been defective in that initially they did not spell out that Negro pupils, whether they lived inside or outside the City, were entitled to attend any school operated by the City or County. The evidence also indicates, however, that as a result of proper notices in the newspaper and personal contacts by the school officials, most if not all of the Negroes actually knew that they had this right under the plan. In any event, we believe and so rule that, beginning with the school year 1968–69, the City and County Boards must use a joint personal written

notice form and a joint advertisement in the newspaper which must make clear that all pupils have the right to attend any school in the entire County of proper grade level. If the Attorney General desires that the forms of the notices and the time they will be distributed or run in the newspaper be crystalized and that the time and manner of handling registration be crystalized, counsel should attempt to agree on such provisions in the decree; otherwise, the Court will decide these matters.

To require the dissolution of the City school system and a transfer of its assets and liabilities to the County, as the Attorney General seeks, would create some obvious legal problems and could create some legal problems not foreseeable. In any event, in view of the fact that the two systems under the freedom of choice plan are in practical effect operating as one so far as the pupils are concerned, we see no need to take this action.

As heretofore stated, the Attorney General proposes that, to be effective for the coming school year 1967–68, eight specified elementary schools operated by the County and having only Negro pupils be closed and their pupils transferred to other specified elementary schools. The proposal is that these pupils be transferred to Haywood Elementary, Anderson Grammar and to certain elementary schools operated by the County which have only white pupils. The proof does clearly show that several of the elementary school buildings in the County system, and particularly buildings used by Negroes, are quite inadequate, some of them being of the "pot-bellied stove, outside privy" variety. The proof also shows, however, that since around 1960 many of such school buildings have been closed and that the County is following a definite plan and policy of closing them as the money becomes available to build new school rooms. All one-teacher schools have heretofore been closed. Moreover, while it appears that the schools to which the Attorney General proposes to transfer these pupils have the overall space to accommodate them, provided some federal money is quickly obtained and some portable school rooms set up at two of them, it is not clear that they could be accommodated in the particular grade into which they would be transferred. Further, and as we have heretofore indicated, the County and City are obligated only to afford the pupils being transferred a freedom of choice to attend any school in the entire County.

The County Board has indicated that it can close, effective the coming school year, four additional elementary schools attended by Negroes: Hickory Grove, Fredonia, Taylor's Chapel and Hays Chapel. This should be embodied in the decree. Moreover, the parents of the pupils who attend these schools must be notified forthwith that they may attend any school in the entire County of proper grade level. This policy of closing buildings must be continued so that by 1970–71 there will be no elementary school in the County attended only by Negroes which has an inadequate physical plant.

While the problem apparently has not yet arisen, the decree should provide that in the event the number of pupils selecting a particular school will result in overcrowding, making it necessary to require some of them to exercise a second choice, a preferential right to attend the first selected school must be given to those pupils who live closest to it. The decree must also provide that the freedom of choice provided in the plan must be exercised anew each year by each pupil.

The Attorney General seeks to have thirty-four teachers assigned for the coming year to schools in which they would be in a minority. He also seeks, by 1969–70, to have the pattern of assignment be such that no school would be identifiable as intended for a particular race. It is not clear precisely what is sought to be required by 1969–70; we assume the Attorney General means that in each school the proportion of Negro to white teachers would be the same or nearly the same as the proportion in the system as a whole. This would mean

that, unless the present proportion employed in the whole system is changed, there would be one Negro and one white teacher in each two-teacher school and a majority of Negro teachers in all other schools.

The question of faculty desegregation had never been dealt with by the Supreme Court until it decided Bradley v. School Board of the City of Richmond, Va., 382 U.S. 103, 86 S.Ct. 224, 15 L.Ed. 2d 187 (1965) and Rogers v. Paul, 382 U.S. 198, 86 S.Ct. 358, 15 L.Ed.2d 265 (1965). In these *per curiam* opinions the Court held only that plaintiffs seeking desegregation of schools are entitled to a full evidentiary hearing and a determination as to the effect on the adequacy of a pupil desegregation plan of faculty allocation on a racial basis. Our Court of Appeals, in Monroe v. Board of Commissioners of the City of Jackson, Tennessee, 6 Cir., 380 F.2d 955 (decided July 21, 1967), points out that while these Supreme Court opinions prohibit recognition of the free choice of teachers as a provision in a pupil desegregation plan, no Supreme Court opinion provides a blueprint of what is required.

It is the opinion of this Court that the free choice plan of desegregation adopted by defendants, as it will be amended by the decree to be entered herein, will be adequate if the following steps in faculty desegregation are taken beginning with the coming year:

1. Assign at least three Negro teachers each to Haywood High and Anderson Grammar, two Negro teachers to Haywood Elementary, and one Negro teacher each to Bradford and Holly Grove.

2. Assign at least three white teachers each to Carver High and East Side Elementary and two white teachers each to Bailey and Douglass.

3. Adopt a plan and policy under which race will not be a factor in the hiring, firing, promotion, demotion, and the assignment of teachers, but under which any other factors which have a rational significance in the educational process may be considered.

With respect to transportation to and from the schools, race must not be a factor in the planning of routes and in all other respects in the operation of the transportation system. Moreover, in each school, all curricular and extra-curricular activities must be completely desegregated.

Defendants will file with the Clerk each year prior to October 15th a report reflecting, with respect to the current school year and with respect to each school, the racial composition of the pupils in each grade and the racial composition of the faculty and, as to grades 9 to 12, the subjects taught by each faculty member. The report must also reflect the names and race of new teachers who have begun teaching in the system since the end of the prior school year, the schools to which they have been assigned, and, if teaching in grades 9–12, the subjects they are teaching. A copy of this report will be served on counsel for the Attorney General when filed. These reports must be filed and furnished to such counsel until defendants are relieved of the obligation by order of this Court.

The Court will retain jurisdiction pending the further implementation of the plan.

A decree will be prepared by counsel for entry.